## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

STATE OF TEXAS,
STATE OF ALASKA,
STATE OF ALABAMA,
STATE OF ARKANSAS,
STATE OF FLORIDA,
STATE OF GEORGIA,
STATE OF INDIANA,
STATE OF IOWA,
STATE OF KANSAS,
STATE OF LOUISIANA,
STATE OF MISSOURI,
STATE OF MONTANA,
STATE OF NEBRASKA,
STATE OF SOUTH CAROLINA,
STATE OF SOUTH DAKOTA,
STATE OF UTAH, and
STATE OF WEST VIRGINIA,

     *Plaintiffs,*

v.

XAVIER BECERRA, in his official capacity as
Secretary of Health and Human Services; UNITED
STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

     *Defendants.*

CASE NO. 5:24-CV-00225

---

## COMPLAINT

1.      On May 9, 2024, the Biden Administration finalized a new rule that upends decades of established federal disability law by adding "gender dysphoria" to the definition of "disability" under Section 504 of the Rehabilitation Act ("Section 504") and the Americans with Disabilities Act ("ADA"). *Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal*

*Financial Assistance*, 89 Fed. Reg. 40,066, 40,068–69 (May 9, 2024) ("Final Rule"). The Final Rule unlawfully changes the express terms of both Section 504 and the ADA, thereby exposing Texas, Alaska, Alabama, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Louisiana, Missouri, Montana, Nebraska, South Carolina, South Dakota, Utah and West Virginia, and their agencies to the loss of federal funding.

2.      When Congress enacted Section 504 and the ADA, it established as a matter of law that "transvestism, transsexualism . . . [and] gender identity disorders not resulting from physical impairments, or other sexual behavior disorders," are *not* protected disabilities. 42 U.S.C. § 12211(b)(1); 29 U.S.C. § 705(20)(F)(i).

3.      The Final Rule's stipulation that gender dysphoria "may be a disability" is contrary to the express language in the Rehabilitation Act and the ADA, and the Court should set aside the Final Rule, enjoin Defendants from enforcing or implementing it, and declare it unlawful.

4.      In addition to its attempt to expand the statutory definition of "disability," the Final Rule further exceeds HHS's statutory authority by (1) obligating all recipients of federal financial assistance to provide services in "the most integrated setting," as defined in the Final Rule; (2) prohibiting actions that result in "serious risk of institutionalization"; and (3) allowing discrimination claims to be brought when no institutionalization or segregation has actually occurred.

5.      The Final Rule should also be set aside as arbitrary and capricious because, *inter alia*, (1) HHS failed to conduct a meaningful inquiry into the cost to States; (2) HHS has created conflicting obligations and permission structures between different federal agencies; (3) it prevents States from innovating and improving their service delivery systems; (4) it creates a regime that is impossible for any State to fully comply with; and (5) HHS summarily rejected federal law that contradicted its policy preferences.

## PARTIES

6.     Plaintiff Texas is a sovereign State of the United States.

7.     Plaintiff Alaska is a sovereign State of the United States.

8.     Plaintiff Alabama is a sovereign State of the United States.

9.     Plaintiff Arkansas is a sovereign State of the United States.

10.     Plaintiff Florida is a sovereign State of the United States.

11.     Plaintiff Georgia is a sovereign State of the United States.

12.     Plaintiff Indiana is a sovereign State of the United States.

13.     Plaintiff Iowa is a sovereign State of the United States.

14.     Plaintiff Kansas is a sovereign State of the United States.

15.     Plaintiff Louisiana is a sovereign State of the United States.

16.     Plaintiff Missouri is a sovereign State of the United States.

17.     Plaintiff Montana is a sovereign State of the United States.

18.     Plaintiff Nebraska is a sovereign State of the United States.

19.     Plaintiff South Carolina is a sovereign State of the United States.

20.     Plaintiff South Dakota is a sovereign State of the United States.

21.     Plaintiff Utah is a sovereign State of the United States.

22.     Plaintiff West Virginia is a sovereign State of the United States.

23.     Defendant Xavier Becerra is the Secretary of the Department of Health and Human Services. He is sued in his official capacity.

24.     Defendant the United States Department of Health and Human Services is the executive agency of the federal government that promulgated and now enforces the Final Rule.

## JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1361.

26.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702, 703, and 706; 8 U.S.C. §§ 1361, 2201, and 2202; and the Court's inherent equitable powers.

27.     Venue lies in this district under 28 U.S.C. § 1391(e)(1) because an agency of the United States is a defendant, and because Texas resides in every judicial district and division within its borders, including this one. *See*, *e.g.*, *Utah v. Walsh*, 2:23-cv-16, 2023 WL 2663256, at \*3 (N.D. Tex. Mar. 28, 2023) (Kacsmaryk, J.) ("Texas resides everywhere in Texas.").

## Factual and Legal Background

### I.    The Rehabilitation Act

28.     Congress passed the Rehabilitation Act in 1973, and Section 504 of the Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Section 504 applies specifically to: (1) programs receiving federal funds, (2) executive agencies, and (3) the United States Postal Service. 29 U.S.C. § 794.

29.     Section 504 applies broadly—it prohibits "any program or activity" that receives federal financial assistance from discriminating against a qualified individual with a disability. 29 U.S.C. § 794(a). And "program or activity" includes all the operations of:

(1)     a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(2)     the entity of such State or local government that distributes such assistance and each such department of agency (and each other State of local government entity) to which the assistance is extended, in the case of assistance to a State or local government; . . . any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b).

30.     While Congress has amended Section 504 on multiple occasions, it has never departed from the Act's core purpose: to allow individuals to participate in programs and employment free from discrimination based on disability. And never has Congress affirmatively

required recipients to create entire new systems of care or subordinate state policy and fiscal judgments to the federal government.

31.     Nor has Congress expressly delegated authority to allow administrative agencies to enact these requirements. "Any interpretation of § 504 must therefore be responsive to two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds." *Alexander v. Choate*, 469 U.S. 287, 299 (1985).

## II.     The Americans with Disabilities Act

32.     The Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, was enacted in 1990 and has similar provisions that are interpreted in tandem with Section 504. The ADA explicitly states that "[e]xcept as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard" than Section 504 and regulations issued by federal agencies pursuant to Section 504. 42 USC § 12201(a). But the ADA applies to a broader swath of entities than Section 504 because it is not tied to receipt of federal funds.

33.     Under the ADA, a covered entity[1] cannot "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

## III.     The Rehabilitation Act and the ADA share a definition of "disability."

34.     The Americans with Disabilities Act defines "disability" as an individual with (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1).

---

[1]     A covered entity includes "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). Because Texas, Alaska, Alabama, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Louisiana, Missouri, Montana, Nebraska, South Carolina, South Dakota, Utah, and West Virginia are employers, they constitute "covered entit[ies]" under the ADA.

35.     The statute expressly excludes from that definition "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders." 42 U.S.C. § 12211(b)(1).

36.     In other words, "tranvestism, transsexualism, pedophilia, exhibitionism, voyeurism," and "gender identity disorders" that are the result of purely mental impairment are not protected categories under the ADA.

37.     A "qualified individual" is defined as "handicapped individual who meets eligibility requirements relevant to the receipt of services provided in the program or activity." 29 C.F.R. § 32.3 (implementing the Rehabilitation Act).

38.     Section 504 incorporates the ADA's definition of "disability." 29 U.S.C. § 705(9)(B), (20)(B) for certain purposes. And like the ADA, Section 504 also explicitly excludes from that definition "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders" for other purposes. 29 U.S.C. § 705(20)(F)(i).

39.     For the purposes of this lawsuit, the term "disability" is identical in the Rehabilitation Act and the ADA.

## IV.    The Medicaid Program

40.     Medicaid is a health insurance program for needy individuals which is administered by states according to federal requirements and is funded jointly by States and the federal government.

41.     Participation in Medicaid is not mandatory, but States that choose to participate must meet federal requirements.

42.     The *federal* Medicaid rules favor institutional and medical-model care. Since its inception, Medicaid has paid for care through a medical and institutional care model, not through a community-based model.

43.     While Congress has created options for States to seek "waivers" of normal Medicaid rules in order to expand services in community settings, 42 U.S.C. §1396n, States are required to go through lengthy, expensive, and cumbersome application and renewal processes to implement these waivers.

44.     The Centers for Medicare & Medicaid Services (CMS) is an administrative agency within the Department of Health and Human Services.

45.     CMS has oversight of Medicaid and Medicaid waiver programs. To receive approval for a waiver, a State must prove to CMS that the average annual cost of waiver services will not exceed that of institutional services. This concept is known as "cost neutrality." Capping enrollment in a waiver program is a common and accepted method of achieving the required cost neutrality.

## The Final Rule

**I.     HHS's definition of disability contradicts express statutory language.**

46.     Defendants published the Final Rule to "amend[] [HHS's] existing section 504 regulation on nondiscrimination obligations for recipients of Federal financial assistance." 89 Fed. Reg. 40,066.

47.     Even though federal law excludes transvestism, transsexualism, and other gender identity disorders as protected disabilities, the Final Rule asserts that "gender dysphoria . . . may be considered a physical or mental impairment" entitled to protection. 89 Fed. Reg. 40,069. "[T]he Department agrees with the Fourth Circuit that gender dysphoria can satisfy" the definition of "disability." 89 Fed. Reg. at 40,069.

48.     Expressly including gender dysphoria as a potentially-protected condition when federal law explicitly excludes it is contrary to law and exceeds Defendants' statutory authority.

49.     The Final Rule incorporates the enforcement mechanisms under Title I of the ADA, 42 U.S.C. §§ 12111 et seq. 89 Fed. Reg. at 40, 185 (codified at 45 C.F.R. § 84.16(b). In turn,

Title I adopts the powers, remedies, and procedures of Title VII of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000e-4 *et seq.*

50.     As a result, an aggrieved employee may file a charge with EEOC against his employer. 42 U.S.C. §§ 2000e-5(b), 2000gg-2, 2000gg-4. The EEOC will then investigate the charges and seek a conciliation agreement. 42 U.S.C. §§ 2000e-5(b), (f); *see also* 42 U.S.C. §§ 2000e-8; 42 U.S.C. §§ 2000e-9. If no agreement is reached, EEOC will either bring a civil action against an employer or decline and issue a notice to the employee of his right to sue. 42 U.S.C. § 2000e-5(f). In the case of a government employer, once conciliation fails, EEOC refers the case to the Attorney General who can bring suit or issue a right-to-sue notice to the employee. *Id.* Besides individual charges, the Attorney General is authorized to bring a civil action against an employer based on "a pattern or practice of resistance." 42 U.S.C. §§ 2000e-6.

51.     The Final Rule addresses childcare, preschool, elementary and secondary education, and adult education programs or activities that receive federal financial assistance. 89 Fed. Reg. at 40,187 (codified at 45 C.F.R. § 84.31). In this context, the Final Rule states that a recipient that provides childcare, preschool, elementary, and secondary or adult education "may not, on the basis of disability, exclude qualified individuals with disabilities and shall take into account the needs of such persons in determining the aids, benefits, or services to be provided." 89 Fed. Reg. at 40,187 (codified at 45 C.F.R. § 84.38).

52.     For example, "[a] recipient that provides housing to its students without disabilities shall provide comparable, convenient, and accessible housing to students with disabilities at the same cost as to others." 89 Fed. Reg. at 40,187 (codified at 45 C.F.R. § 84.45(a)).

53.     The Final Rule also applies to the child welfare system. The Final Rule specifically states that "[n]o qualified individual with a disability shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any child welfare program or activity that receives Federal financial assistance." 89 Fed. Reg. at 40,188 (codified at 45 C.F.R. § 84.60(a)(1)).

54.     According to the Final Rule, such discrimination includes (1) "[d]ecisions based on speculation, stereotypes, or generalizations that a parent, caregiver, foster parent, or prospective parent, because of a disability, cannot safely care for a child;" and (2) "[d]ecisions based on speculation, stereotypes, or generalizations about a child with a disability." 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

55.     Further the Final Rule requires such a recipient—whether directly or through contracts, agreements, or other arrangements—to not (1) "[d]eny a qualified parent with a disability custody or control of, or visitation to, a child;"(2) "[d]eny a qualified parent with a disability an opportunity to participate in or benefit from any and all services provided by a child welfare agency, including but not limited to, family preservation and reunification services equal to that afforded to persons without disabilities;" (3) "[t]erminate the parental rights or legal guardianship of a qualified individual with a disability;" (4) "[d]eny a qualified caregiver, foster parent, companion, or prospective parent with a disability the opportunity to participate in or benefit from child welfare programs and activities;" or (5) "[r]equire children, on the basis on the disability, to be placed outside the family home through custody relinquishment, voluntary placement, or other forfeiture of parental rights in order to receive necessary services." 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(b)(1)–(5)).

56.     The Final Rule's requirements for each of these various contexts is important because all such requirements hinge on an individual having a "disability," which now may include "gender dysphoria."

57.     "[R]estrictions that prevent, limit, or interfere with otherwise qualified individuals' access to care due to their gender dysphoria, gender dysphoria diagnosis, or perception of gender dysphoria may violate section 504." *Id*.

58.     But while implicitly acknowledging that federal law explicitly excludes from the definition of "disability" "gender identity disorders not resulting from physical impairments[] or other sexual behavior disorders," 42 U.S.C. § 12211(b)(1); 29 U.S.C. § 705(20)(F)(i), Defendants then attempt to distinguish "gender identity disorder" from "gender dysphoria." According to

Defendants, "when Congress enacted the ADA in 1990, 'gender identity disorders' referred to a person's mere identification with a different gender than the sex they were assigned at birth, a condition that is not a disability. Gender dysphoria, by contrast, may be a disability, one that is characterized by clinically significant distress or impairment in social, occupational, or other important areas of functioning; thus gender dysphoria does not fall within the statutory exclusions for gender identity disorders." 89 Fed. Reg. at 40,069.

59.     In fact, the Final Rule declares that "gender dysphoria does not fall within the statutory exclusions for gender identity disorders." 89 Fed. Reg. at 40,069.

60.     To support this assertion, the Final Rule relies on the Fourth Circuit case of *Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022). There, the plaintiff was a male who believed that he was a female. *Id.* at 763–64. He was incarcerated for six months, *id.* at 763, and was initially assigned to the female side of the jail, *id.* at 764. But after a preliminary medical examination showed that the plaintiff had male genitalia, he was transferred to the male side of the jail pursuant to jail policy. *Id.* at 764. While incarcerated, the plaintiff had several complaints about his treatment, including being searched by male deputies instead of female deputies. *Id.* at 764–65. After his release, he sued jail officials asserting violations of the ADA and Rehabilitation Act, among other claims. *Id.* at 765.

61.     The district court dismissed the ADA and Rehabilitation Act claims because gender dysphoria is not a "disability" under the ADA but is instead an identity disorder not resulting from physical impairments. *Id.* But the Fourth Circuit reversed.

62.     The Fourth Circuit agreed with the plaintiff's first argument that gender dysphoria categorically is not a protected gender identity disorder. *Id.* at 766. The Fourth Circuit specifically noted that the version of the Diagnostic and Statistical Manual of Mental Disorders (DSM) in effect in 1990 (DSM-III-R):

> did not acknowledge gender dysphoria either as an independent diagnosis or as a subset of any other condition. But it did recognize a class of other disorders that it characterized as "gender identity disorders." According to the [DSM-III-R], "[t]he essential feature" of a "gender identity disorder"

was "an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity."

*Id.* at 767.

63.     According to the Fourth Circuit:

advances in medical understanding led the American Psychiatric Association (APA) in 2013 to remove "gender identity disorders" from the most recent DSM (5th ed. 2013), the DSM-5. At the same time as the APA removed "gender identity disorder" from the DSM-5, the APA added the diagnosis of "gender dysphoria," which did not exist as a diagnosis in 1990.

*Id.* (footnote omitted).

64.     The Fourth Circuit then concluded:

The very fact of revision suggests a meaningful difference, and the contrast between the definitions of the two terms—gender identity disorder and gender dysphoria—confirms that these revisions are not just semantic. Indeed, the definition of gender dysphoria differs dramatically from that of the now-rejected diagnosis of "gender identity disorder." Rather than focusing exclusively on a person's gender identity, the DSM-5 defines "gender dysphoria" as the "*clinically significant distress*" felt by some of those who experience "an incongruence between their gender identity and their assigned sex."

*Id.* (emphasis in original).

65.     The Fourth Circuit expanded on its vision of the "meaningful difference":

Not only are "gender identity disorder" and gender dysphoria characterized by different symptoms; they also affect different populations. As [the plaintiff] acknowledges in [his] complaint, "gender dysphoria" is "a disability suffered by many (but certainly not all) transgender people." . . . But "[f]or a subset of transgender people ... the incongruence results in gender dysphoria — i.e., a feeling of stress and discomfort with one's assigned sex."

*Id.* at 768.

66.     In other words, the Fourth Circuit concluded (wrongly) that people suffering from gender dysphoria were a subset of people with "gender identity disorders"—the subset of people with gender identity disorders who felt stress and discomfort from their gender identity disorder.

11

67.    But if gender dysphoria is a subset of gender identity disorder, then gender dysphoria is included in gender identity disorders—and gender dysphoria cannot be separate from gender identity disorders.

68.    The Fourth Circuit's reasoning is also flawed because, in 1990, the DSM-III-R described "transsexualism" thusly:

> The essential features of the heterogeneous disorder are a persistent sense of *discomfort* and *inappropriateness* about one's anatomical sex and a persistent wish to be rid of one's genitals and to live as a member of the other sex. The diagnosis is made only if the *disturbance has been continuous* (not limited to periods of stress) for at least two years . . . **Associated features.** Generally, there is *moderate to severe coexisting personality disturbance*. Frequently there is *considerable anxiety and depression*, which the individual may attribute to inability to live in the role of the desired sex . . . **Impairment and complications.** *Frequently social and occupational functioning are markedly impaired*, partly because of associated psychopathology and partly because of problems encountered in attempting to live in the desired gender role. *Depression is common*, and can lead to suicide attempts. In rare instances males may mutilate their genitals.

DSM-III-R at 261–63 (emphasis added).

69.    So, the "discomfort" of those who felt "inappropriateness about [their] anatomical sex" in the DSM-III-R was a necessary component of transsexualism; making it materially indistinguishable from the "clinically significant distress" of those who feel "an incongruence between their gender identity and their assigned sex" in the DSM-5's gender dysphoria condition. That newer editions of the DSM have moved the "associated features" and "impairment and complications" of transsexualism into the diagnostic criteria and rebranded it "gender dysphoria" does not make the two distinct conditions with different symptoms and affecting different populations.

| Transsexualism Criteria (DSM-III-R) | Gender Dysphoria Criteria (DSM-V-TR) |
|---|---|
| A. Sense of discomfort and inappropriateness about one's anatomic sex<br>B. Wish to be rid of one's own genitals and to live as a member of the other sex.<br>C. The disturbance has been continuous (not limited to periods of stress) for at least two years.<br>D. Absence of physical intersex or genetic abnormality.<br>E. Not due to another mental disorder, such as Schizophrenia. | A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:<br>  1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).<br>  2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).<br>  3. A strong desire for the primary and/or secondary sex characteristics of the other gender.<br>  4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).<br>  5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).<br>  6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).<br>B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. |

70.     The Fourth Circuit also agreed with the plaintiff's second argument that gender dysphoria results from a physical basis that places it outside the scope of the exclusion from ADA

protection. It first noted that the plaintiff's opponent "does not argue that gender dysphoria never results from a physical impairment; [he] concedes that it sometimes may." *Id.* at 770.

71.     As Justice Alito later commented:

> The ground on which the majority concluded that [the plaintiff's] complaint sufficiently alleged a physical impairment is not entirely clear, but the [Fourth Circuit] majority's reasoning appears to be that [the plaintiff] has a physical need for hormonal treatment because, without it, [the plaintiff] experiences "physical distress." In addition, the majority noted "medical and scientific research identifying possible physical bases of gender dysphoria."

*Kincaid v. Williams*, 143 S. Ct. 2414, 2416 (2023) (Alito, J., dissenting from the denial of certiorari) (cleaned up).

72.     But this argument is wrong, as Justice Alito also noted:

> [T]he Fourth Circuit's understanding of when a gender identity disorder "result[s] from physical impairments" does not meaningfully distinguish physical impairments from "mental impairment[s]," which the ADA recognizes as a distinct category. §§ 12102(1)(A), 12211(b)(1). Many common mental impairments, such as depression and anxiety disorders, cause real and sometimes powerful physical distress and are treated by chemical interventions. That does not mean, however, that those mental impairments are caused by an independent physical trait that itself qualifies as an impairment.

*Id.* at 2417–18.

73.     The Fourth Circuit also acknowledged that it might be wrong:

> Our approach today acknowledges that courts typically lack sufficient expertise in physiology, etiology, psychiatry, and other potentially relevant disciplines to determine the cause or causes of gender dysphoria. Especially at this early stage, to dismiss a case based on such unknowns would be wholly premature and speculative.

*Id.* at 772.

74.     Gender dysphoria cannot be confirmed or denied by any physical test. That means that it cannot "result[] from physical impairments" and therefore it is necessarily excluded from the definition of "disability."

75.     The Final Rule commits the same error as the Fourth Circuit. Defendants define gender dysphoria as a subset of gender identity disorders, which means it cannot, as a matter of law, be a protected disability unless it results from physical impairments.

76.     The Rule's definition of gender dysphoria as a disability is wrong because gender dysphoria is excluded from the definition of disability because it is a "gender identity disorder[] not resulting from physical impairments." 42 U.S.C. § 12211(b)(1); 29 U.S.C. § 705(20)(F)(i). Or at least, it falls within the category of "other sexual behavior disorders." 42 U.S.C. § 12211(b)(1); 29 U.S.C. § 705(20)(F)(i).

77.     "When called on to resolve a dispute over a statute's meaning, this Court normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them." *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021).

78.     When the ADA was adopted, "gender identity disorder" included feelings of "discomfort and a sense of the inappropriateness about the assigned sex," and the first "diagnostic criteria" for gender identity disorder under the DSM-III-R is "persistent or recurrent discomfort and a sense of inappropriateness about one's assigned sex." *Williams*, 45 F.4th at 781–82 (Quattlebaum, J., dissenting).

79.     Even under the Fourth Circuit majority's "subset" theory, adopted in the Final Rule, gender dysphoria is a subset of gender identity disorders not resulting from physical impairments, and so is included in gender identity disorders not resulting from physical impairments—and cannot be excluded from gender identity disorders not resulting from physical impairments.

80.     Because gender dysphoria is purely psychological, not physical, and cannot be confirmed or falsified by any physical test, it is not and cannot be a disability under Section 504 and

the ADA because it is a "gender identity disorder[] not resulting from physical impairments," which are excluded from the definition of "disability" in both statutes. 29 U.S.C. § 705(20)(F)(i).

## II.    HHS's "integration mandate" exceeds statutory authority and conflicts with federal law.

81.    The Final Rule adds a mandate for "integration" which requires every "recipient" of "federal finance assistance" "administer a program or activity in the most integrated setting appropriate to the needs of a qualified person with a disability." 89 Fed. Reg. at 40,192.

82.    The Final Rule defines "recipient" as

> any State or its political subdivision, any instrumentality of a State or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance.

89 Fed. Reg. at 40,184.

83.    The Final Rule defines "federal financial assistance" as

> any grant, cooperative agreement, loan, contract (other than a direct Federal procurement contract or a contract of insurance or guaranty), subgrant, contract under a grant or any other arrangement by which the Department provides or otherwise makes available assistance in the form of: (1) Funds; (2) Services of Federal personnel; (3) Real and personal property or any interest in or use of such property, including: (i) Transfers or leases of such property for less than fair market value or for reduced consideration; and (ii) Proceeds from a subsequent transfer or lease of such property if the Federal share of its fair market value is not returned to the Federal Government; And (4) *Any other thing of value* by way of grant, loan, contract, or cooperative agreement.

89 Fed. Reg. at 40,183 (emphasis added).

84.    The Final Rule defines "most integrated setting" as

> a setting that provides individuals with disabilities the opportunity to interact with nondisabled persons to the fullest extent possible. These settings provide opportunities to live, work, and receive services in the greater community, like individuals without disabilities; are located in mainstream society; offer access to community activities and opportunities

at times, frequencies and with persons of an individual's choosing; and
afford individuals choice in their daily life activities.

89 Fed. Reg. at 40,183.

85.     Anything short of that is considered "segregated" and therefore discriminatory.
And the obligation to provide a specific service in a community setting is practically limitless, no
matter how specialized and regardless of whether a specific service is designed for a non-
community setting.

**A. The Final Rule mischaracterizes *Olmstead*.**

86.     In imposing the "integration mandate," HHS claims to be codifying "longstanding
case law" and cites specifically to the *Olmstead* case for its proposition that "covered entities"
must "serve individuals with disabilities in the most integrated setting appropriate to their needs."
89 Fed. Reg. at 40,117. But what is required by the Final Rule goes well beyond even the most
liberal reading of *Olmstead*.

87.     In *Olmstead*, two individuals in a psychiatric institution who could have been served
in a less restrictive setting – sued Georgia under the ADA and its implementing regulations,
challenging their continued institutionalization.[2] *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581
(1999).

88.     While the Court held unnecessary institutionalization could constitute
discrimination under the ADA, the plurality's decision was tightly cabined. The Court held that
unnecessary institutionalization only constitutes discrimination when:

  i.   the State's treatment professionals determine that community-based treatment is
       appropriate,

 ii.   the affected persons do not oppose such treatment, and

iii.   the placement can be reasonably accommodated, taking into account the resources
       available to the State and the needs of others with mental disabilities.[3]

---

[2]     The ADA regulations in that case were not in themselves held valid, as the Court expressly
refrained from deciding a question not raised by the parties. *Olmstead*, 527 U.S. at 592.

[3]     The latter language—"taking into account the resources available to the State and the

*Id*. at 607.

89.    The Court was also careful to recognize the important role the states play in treating individuals with disabilities, and it emphasized that its holding did not require states to create new programs out of whole cloth. Justice Kennedy, casting the decisive fifth vote, explained:

> Of course, it is a quite different matter to say that a State without a program in place is required to create one. No State has unlimited resources, and each must make hard decisions on how much to allocate to treatment of diseases and disabilities. If, for example, funds for care and treatment of the mentally ill, including the severely mentally ill, are reduced in order to support programs directed to the treatment and care of other disabilities, the decision may be unfortunate. The judgment, however, is a political one and not within the reach of the statute.

*Olmstead*, 527 U.S. at 612–13 (Kennedy, J., concurring) (emphasis added).

90.    Here, the Final Rule, despite purporting to be consistent with *Olmstead*, removes those political judgments from the hands of the states by requiring them to design (or redesign) their systems and programs, for all individuals with disabilities, to eliminate "practices that result in . . . serious risk of institutionalization." 89 Fed. Reg. at 40,192. And the Final Rule apparently gave no thought to whether that result was even achievable, or how much it might cost.

91.    For some individuals, placement in a community setting is inappropriate and will fail to meet their level of need. As noted by Justice Kennedy, the Congressional findings underlying the ADA "do not show that segregation and institutionalization are always discriminatory or that segregation or institutionalization are, by their nature, forms of prohibited discrimination." *Id.* at 614.

92.    The Final Rule's mandate realizes the very concerns articulated by Justice Kennedy:

> It would be unreasonable, it would be a tragic event, then, were the Americans with Disabilities Act of 1990 (ADA) to be interpreted so that states had some incentive, for fear of litigation, to drive those in need of

---

needs of others with mental disabilities"—is a formulation of the fundamental alteration defense. States are required only to make *reasonable* modifications and cannot be required to make modifications that "would fundamentally alter the nature of the service, program, or activity." *Arc of Washington State Inc. v. Braddock*, 427 F.3d 615, 618 (9th Cir. 2005).

> medical care and treatment out of appropriate care and into settings with
> too little assistance and supervision.

*Id.* at 610.

### B. Defendants' "at risk" theory exceeds their statutory authority and conflicts with federal law.

93.    The Final Rule also codifies the "at-risk" theory of discrimination, whereby individuals who are not actually institutionalized or even facing imminent institutionalization can bring a claim for discrimination based on the notion that the distribution of resources within a State's system of care somehow places them "at serious risk of institutionalization." 89 Fed. Reg. at 40,120–21, 40,192.

94.    This theory is described in a 2020 Department of Justice (DOJ) guidance document that serves as a structural pillar to this Final Rule and for litigation brought by DOJ against various states:

> the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings. Individuals need not wait until the harm of institutionalization or segregation occurs or is imminent. For example, a plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services or its cut to such services will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution.

*Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.,* https://www.ada.gov/resources/olmstead-mandate-statement/ (last visited Sep. 19, 2024) (emphasis added).

95.    But both the DOJ guidance document and the Final Rule are directly contrary to Fifth Circuit authority issued just a week after Defendants' Notice of Proposed Rulemaking.

96.    On September 20, 2023, the Fifth Circuit expressly rejected the "at risk" theory underpinning much of the Proposed Rule and litigation brought by the DOJ under the ADA. The court explained: "Nothing in the text of Title II, its implementing regulations, or *Olmstead* suggests

that risk of institutionalization, without actual institutionalization, constitutes actionable discrimination."[4]

97.    Nevertheless, Defendants claims the Final Rule is consistent with "major legislative and judicial developments." 89 Fed. Reg. at 40,066. When confronted with the Fifth Circuit decision, Defendants summarily dismissed this Circuit's precedent as mere "dicta." 89 Fed. Reg. at 40,120.

98.    Ignoring the Fifth Circuit's decision, the Final Rule cites to "consensus in circuit courts" and "affirms its decision to codify the 'at serious risk of institutionalization' principle." 89 Fed. Reg. at 40,120.

99.    Despite receiving comments from those concerned about the vague and undefined standards for determining who is "at risk" of institutionalization, Defendants explicitly refused to provide states with the rules of the game, declining to include in the Final Rule the "parameters of the inquiry into 'serious risk.'" 89 Fed. Reg. at 40,121.

## III.    The Final Rule exposes States to withdrawal of federal funding, jeopardizes medical assistance programs, and penalizes States that act in compliance with requirements from other federal agencies.

100.    What States are left with, then, is a broad and nebulous requirement to provide unlimited community-based services in every setting to eliminate institutionalization (regardless of whether it is appropriate in a given case) or even any serious risk of institutionalization (regardless of whether that risk is ever imminent or realized).  The Final Rule asserts that a State's "planning, service system design, funding, or service implementation practices" may be discriminatory if they do not eliminate the serious risk of institutionalization. 89 Fed. Reg. at 40,192.

101.    The Final Rule requires States to do whatever it takes to achieve HHS's vision, no matter the cost or impact on state operations, with the federal government micromanaging down to a personnel level (the Final Rule notes that if a workforce shortage affects a State, the State must

---

[4]    *United States v. Mississippi*, 82 F.4th 387, 398 (5th Cir. 2023).

"address staffing shortages through pay rates, recruitment and retention incentives, flexible scheduling such as split shifts, or other actions."). 89 Fed. Reg. at 40,122.

102.   States are even penalized for improving service offerings – the Final Rule asserts that when an optional benefit is "provided in institutions or other segregated settings as part of the recipient's program, the same or a substantially similar benefit must be offered in an integrated setting in a manner that does not incentivize institutional or other segregated services over community services." 89 Fed. Reg. at 40,121.

103.   The Final Rule requires recipients to allow "a qualified individual with a disability the opportunity to participate in programs or activities that are not separate or different, *despite the existence of permissibly separate or different* programs or activities." 89 Fed. Reg. at 40,189 (emphasis added).

## IV.   The Final Rule completely disregards "the legitimate interests of federal grantees in preserving the integrity of their programs," *Alexander v. Choate*, 469 U.S. 287, 300.

### A.  Impact of the Final Rule on Texas.

104.   By including gender dysphoria within the definition of disability in the employment context, Texas's agencies, as employers, must expend time, money, and resources to provide what Defendants believe are reasonable accommodations to those diagnosed with gender dysphoria. Such accommodations likely include using employees' preferred names and pronouns that do not align with their biological, immutable sex, allowing employees to dress as a member of the opposite sex in violation of dress codes prohibiting unprofessional or inappropriate clothing, and allowing employees to use sex-segregated bathrooms and locker rooms that do not align with their biological, immutable sex.

105.   If Texas does not provide these accommodations, it is now at risk of being subjected to investigations, charges, or lawsuits by allegedly aggrieved employees or the federal government. 42 U.S.C. §§ 2000e-5(b), (f), 2000gg-2, 2000gg-4; *see also* 42 U.S.C. §§ 2000e-6, 2000e-8, 2000e-9. In fact, the Texas Department of Agriculture already has a written dress code and grooming policy that distinguishes between dress codes and grooming practices for male and female

employees. *See* Ex. A (Texas Department of Agriculture's Dress Codes and Grooming Policies). The Final Rule would force the Texas Department of Agriculture to modify its current policies, procedures, and practices when it comes to dress codes and grooming policies.

106.    The Final Rule affects Texas's Department of Family and Protective Services (DFPS). It requires DFPS to elevate the terms of the Final Rule over the requirements of the Texas Family Code when it comes to decisions about removal and termination of parental rights. *See* 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

107.    All these requirements impose substantial costs and injuries on Texas. The Final Rule itself acknowledges that States, like Texas, will incur annualized costs of about $563.6 million per year at a 3% discount rate and $589.8 million at a 7% discount rate. 89 Fed. Reg. at 40,178.

108.    In sum, the Final Rule imposes severe and irreparable harm on Texas by imposing various costs, burdens, and attendant risks of administrative proceedings, investigations, lawsuits, and compliance measures as well as by creating a conflict between state laws and policies and federal regulation.

### B.  Impact of the Final Rule on Alaska

109.    Alaska participates in the Medicaid program and must comply with strict rules and regulations set by CMS.

110.    Medicaid accounts for a significant portion of Alaska's state budget.

111.    CMS rules include constraints on the state's ability to change or increase reimbursement rates for providers, such as the "upper payment limit."

112.     The range of services available through Medicaid depends on a variety of factors, many of which are beyond Alaska's control, including the extent to which provider workforce exists, where providers are willing and able to open and sustain a practice, and whether providers opt in to accepting Medicaid reimbursement by enrolling with the state as a Medicaid provider.

113.    Alaska has a unique tribal health system integral to its system of care that is operated by sovereign tribal nations.

114.    Tribal providers participate in Medicaid but are paid on an "encounter" rate which is set annually by the federal government. The State does not determine this rate.

115.    Alaska cannot require tribal entities to offer specific services in compliance with the Final Rule, though the Final Rule would require the State as a "recipient" to ensure that all entities it directs HHS funding to also comply with the Final Rule.

116.    Alaska's unique frontier geography and demographic characteristics make it impossible to provide every service in every community setting. For example, 86% of Alaska's communities cannot be reached by road, which presents a unique challenge not faced by any other State.

117.    Alaska cannot require every Medicaid provider to expand services to the "most integrated setting" described in the Final Rule.

118.    Alaska has implemented six Medicaid waivers to increase the availability of community medical and behavioral health services. Two of these waivers have enrollment caps that were approved by CMS.

119.    Eradicating wait lists for waiver services would eliminate a primary mechanism for controlling costs.

120.    CMS rules do not allow the aggregate waiver amount to exceed the cost of nursing home or institutional care.

121.    Compliance with the Final Rule would jeopardize Alaska's compliance with CMS rules that are necessary for participation in the Medicaid program.

122.    The Final Rule requires the State to ensure that every recipient of Medicaid funding also complies with the Final Rule. "Recipients retain responsibility for ensuring that entities to which they provide significant assistance comply with section 504." 89 Fed. Reg. at 40,109.

123.    The Final Rule imposes requirements that are not achievable for providers, and thus increases the likelihood that providers will choose not to participate in Medicaid, which would reduce the level of services available to individuals with disabilities.

124.    Implementation of Medicaid waivers is optional for States.

125.    The Final Rule's requirement that all optional benefits must be provided in "integrated settings" disincentivizes Alaska from offering optional benefits.

126.    Like many areas of the country, Alaska is experiencing significant workforce shortages which affect availability of services.

127.    Alaska has a population of less than 750,000 people. It is not fiscally feasible for its system of care to provide all services across the State in the Final Rule's definition of the most integrated setting in every instance.

128.    Compliance with the Final Rule would require Alaska's legislature to subordinate other legitimate state interests to compliance with the Final Rule.

129.    Compliance with the Final Rule would require Alaska to expend a vast, yet indeterminate amount of general funds to provide the services required.

130.    Compliance with the Final Rule would require fundamentally altering the State's systems, programs, and activities as well as its sovereign administration of the State.

131.    Therefore, the Final Rule causes irreparable and severe harm to Alaska and its citizens.

**C.  Impact of the Final Rule on Alabama.**

132.    Alabama participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

**D.  Impact of the Final Rule on Arkansas.**

133.    Arkansas participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

**E.  Impact of the Final Rule on Florida.**

134.    Florida participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

**F. Impact of the Final Rule on Georgia.**

135.    Georgia participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

**G. Impact of the Final Rule on Indiana.**

136.    Indiana participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

**H. Impact of the Final Rule on Iowa.**

137.    Iowa participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

**I. Impact of the Final Rule on Kansas.**

138.    Kansas participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

**J. Impact of the Final Rule on Louisiana.**

139.    Louisiana participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

**K. Impact of the Final Rule on Missouri.**

140.    Missouri participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

**L. Impact of the Final Rule on Montana.**

141.    By including gender dysphoria within the definition of disability in the employment context, Montana's agencies, as employers, must expend time, money, and resources to provide reasonable accommodations for those suffering from gender dysphoria. Such accommodations might include requiring the use of employees' preferred pronouns, allowing employees to be dressed as a member of the opposite sex in violation of dress codes prohibiting unprofessional or inappropriate clothing, or allowing employees to use the other sex's bathrooms or locker rooms.

142.    If Montana does not provide these accommodations, it is now at risk of being subjected to investigations, charges, or lawsuits by allegedly aggrieved employees or the federal government. 42 U.S.C. §§ 2000e-5(b), (f), 2000gg-2, 2000gg-4; see also 42 U.S.C. §§ 2000e-6, 2000e-8, 2000e-9.

143.    The Final Rule affects Montana's Department of Health and Human Services (DPHHS). It requires DPHHS to elevate the terms of the Final Rule over the requirements of Montana law when it comes to decisions about removal and termination of parental rights. *See* 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

144.    All these requirements impose substantial costs and injuries on Montana. The Final Rule itself acknowledges that States, like Montana, will incur annualized costs of about $563.6 million per year at a 3% discount rate and $589.8 million at a 7% discount rate. 89 Fed. Reg. at 40,178.

145.    Montana participates in the Medicaid program and must comply with strict rules and regulations set by CMS.

146.    Montana's Medicaid program expended approximately $2.40 billion in State Fiscal Year 2023. Of that amount, about 79% (or approximately $1.89 billion) represents federal financial participation.

147.    CMS rules include constraints on Montana's ability to change or increase reimbursement rates for providers, such as the "upper payment limit."

148.     The range of services available through Medicaid depends on a variety of factors, many of which are beyond Montana's control, including the extent to which provider workforce exists, where providers are willing and able to open and sustain a practice, and whether providers opt in to accepting Medicaid reimbursement by enrolling with the Montana Medicaid program as a Medicaid provider.

149.    Montana is committed to increasing access to health care for all Montanans. For example, through its Behavioral Health System for Future Generations efforts, a direct outgrowth of the historic passage of H.B. 872 during the 2023 Legislative Session, it is working to invest $300

million to develop and implement targeted solutions to Montana-specific issues in providing services for Montanans with behavioral health and development disabilities. But Montana's unique rural and frontier geography and demographic characteristics make it impossible to provide every service in every community setting.

150.    Montana cannot require every Medicaid provider to expand services to the "most integrated setting" described in the Final Rule.

151.    Montana has implemented a number of Medicaid waivers to increase the availability of community medical and behavioral health services. Several of these waivers have enrollment caps that were approved by CMS.

152.    Eradicating wait lists for waiver services would eliminate a primary mechanism for controlling costs.

153.    CMS rules do not allow the aggregate waiver amount to exceed the cost of nursing home or institutional care.

154.    Compliance with the Final Rule would jeopardize Montana's compliance with CMS rules that are necessary for participation in the Medicaid program.

155.    The Final Rule requires the state to ensure that every recipient of Medicaid funding also complies with the Final Rule. "Recipients retain responsibility for ensuring that entities to which they provide significant assistance comply with section 504." 89 Fed. Reg. at 40,109.

156.    The Final Rule imposes requirements that are not achievable for providers, and thus increases the likelihood that providers will choose not to participate in Medicaid, which would reduce the level of services available to individuals with disabilities.

157.    Implementation of Medicaid waivers is optional for states.

158.    The Final Rule's requirement that all optional benefits must be provided in "integrated settings" may disincentivize Montana from offering optional benefits.

159.    Like many areas of the country, Montana is experiencing significant workforce shortages which affect availability of services.  Much of Montana has been designated as health professional shortage areas (HPSAs)

160. Montana has a population of less than 1.15 million people. It is not fiscally feasible for its system of care to provide all services across the state in the Final Rule's definition of the most integrated setting in every instance.

161. Compliance with the Final Rule would require Montana's legislature to subordinate other legitimate state interests to Medicaid and other compliance with the Final Rule.

162. Compliance with the Final Rule would require Montana to expend a vast, yet indeterminate amount of general funds to provide the required Medicaid and other services.

163. Compliance with the Final Rule would require fundamentally altering the State's systems, programs, and activities as well as its sovereign administration of the State.

164. In sum, the Final Rule imposes severe and irreparable harm on Montana by imposing various costs and attendant risks of administrative proceedings, investigations, lawsuits, and compliance measures.

**M. Impact of the Final Rule on Nebraska.**

165. Nebraska participates in the Medicaid program and must comply with strict rules and regulations as set by CMS.

166. The Nebraska Department of Health and Human Services (DHHS), which administers Medicaid in the State of Nebraska, is the single largest agency in terms of budget in the state. Medicaid is the single largest portion of that budget.

167. Defining gender dysphoria as a disability and failure to provide services for its treatment as a disability potentially increases or expands the pool of Medicaid eligible Nebraskans who will seek treatment for these conditions.

168. Any increase or expansion in required Medicaid or disability services within the State of Nebraska will represent a concomitant increase in costs to the Medicaid program and the State, during a time in which the State is attempting to responsibly steward its taxpayer funds.

169. By including gender dysphoria within the definition of disability in the employment context, Nebraska's agencies, as employers, must expend time, money, and resources to provide what Defendants believe are reasonable accommodations to those diagnosed with gender

dysphoria. Such accommodations likely include using employees' preferred names and pronouns that do not align with their biological, immutable sex, allowing employees to dress as a member of the opposite sex in violation of dress codes prohibiting unprofessional or inappropriate clothing, and allowing employees to use sex-segregated bathrooms and locker rooms that do not align with their biological, immutable sex.

170.    If Nebraska does not provide these accommodations, it is now at risk of being subjected to investigations, charges, or lawsuits by allegedly aggrieved employees or the federal government. 42 U.S.C. §§ 2000e-5(b), (f), 2000gg-2, 2000gg-4; see also 42 U.S.C. §§ 2000e-6, 2000e-8, 2000e-9. In fact, State law allows educational institutions, for example, to "maintain[] separate toilet facilities, locker rooms, or living facilities for the different sexes." Neb. Rev. Stat. § 79-2,124. Furthermore, the Governor of Nebraska ordered all state executive agencies, in their promulgation of administrative rules, enforcement of administrative decisions, and adjudication of disputes, define "sex" as one's "biological sex (either male or female) at birth." *See* Office of Governor Jim Pillen, Exec. Order No. 23-16 (Aug. 30, 2023), https://govdocs.nebraska.gov /docs/pilot/pubs/eofiles/23-16.pdf. The Final Rule would force Nebraska to modify its current policies, procedures, and practices when it comes to defining sex in the administration of its programs and maintaining separate facilities for both biological sexes.

171.    In 2023, Nebraska passed LB574, entitled and codified at Neb. Rev. Stat. §§ 71-7,301–7,307 as "the Let Them Grow Act." The act statutorily limited gender-altering procedures and gender affirming care for Nebraskans under the age of 19, prohibiting the first and requiring regulations be promulgated to limit the second. In response, DHHS initiated the process to do so under Nebraska law. This included issuing proposed regulations, holding public hearings, signing emergency regulations, and issuing final regulations.

172.    Nebraska law, the democratic and legislative processes which brought about the law, and the public engagement with the regulations promulgated because of the law, would all be put in conflict with the new federal requirements implemented by the Final Rule.

173.     Significant changes to agency operations and the Nebraska Administrative Code (NAC) have been made because of Executive Order 23-16 and the Let Them Grow Act which would require great time and expense to modify in order to comply with the Final Rule.

174.     The Final Rule additionally requires DHHS to elevate the terms of the Final Rule over the requirements of Nebraska law when it comes to decisions about removal and termination of parental rights. *See* 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

175.     Nebraska's rural geography and demographics mean that it faces, like many states, significant hurdles in finding sufficient medical and care personnel for all its communities. Mechanistic and inflexible employment and personnel requirements would require Nebraska to expend a vast, yet indeterminate amount of general funds to comply with the Final Rule. This would also undermine Nebraska's own efforts to address the issue with efficient, targeted solutions proposed through Nebraska's democratic and legislative processes.

176.     Nebraska, like many states, has traditionally utilized a waitlist for waiver services to control costs and ensure the state's commitment to recipients can be properly fulfilled. In March 2024, the Governor of Nebraska announced a plan to eliminate the waitlist for developmental disabilities services. *See* Nebraska Department of Health and Human Services, Governor Pillen Announces Elimination of Developmental Disabilities Registry (Mar. 29, 2024), https://dhhs.ne.gov/Pages/Governor-Pillen-Announces-Elimination-of-Developmental-Disabilities-Registry.aspx.

177.      eliminate the waitlist is driven by state specific solutions, utilizing local resources and opportunities, but without a statutory or regulatory requirement that a waitlist or similar registry never be used again in the future. Such a requirement, as proposed in the Final Rule, eliminates vital flexibility and hampers Nebraska's ability to judge how best to serve its citizens and beneficiaries.

178.     All these requirements impose substantial costs and injuries on Nebraska. The Final Rule itself acknowledges that States, like Nebraska, will incur annualized costs of about $563.6

million per year at a 3% discount rate and $589.8 million at a 7% discount rate. 89 Fed. Reg. at 40,178.

179.    The above costs do not include the cost to the state in terms of holding new public hearings for impacted regulations, or salary hours for state employees to draft the regulations, attend public hearings, process public comments, and the other steps required by the Nebraska Administrative Procedure Act, Neb. Rev. Stat. §§ 84-901–920.

180.    In sum, the Final Rule imposes severe and irreparable harm on Nebraska by imposing various costs and attendant risks of administrative proceedings, investigations, lawsuits, and compliance measures as well as by creating a conflict between state laws and policies and federal regulation.

**N.  Impact of the Final Rule on South Carolina.**

181.    South Carolina participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

**O.  Impact of the Final Rule on South Dakota.**

182.    Thirty of South Dakota's sixty-six counties are rural and thirty-four are frontier. South Dakota Medicaid relies on the availability of a provider workforce and settings which are limited and a challenge to sustain in rural settings.

183.    The Final Rule requires South Dakota to ensure that *every* recipient of Medicaid funding also complies with the Final Rule. Thus, the Final Rule imposes requirements that would increase the likelihood that providers will choose not to participate in Medicaid, affecting the *level* of services available to all individuals with disabilities.

184.    Additionally, this requirement would necessitate more South Dakota Medicaid staff time spent on compliance.

185.    Adding gender dysphoria to the definition of disability potentially creates conflict with state administrative rules that *govern* Medicaid coverage. *See, e.g.,* S.D. Admin R. 67:46:03.

This would essentially add a new category of potentially disabled individuals for whom care would have to be provided, resulting in an unpredictable increased cost to the Medicaid program.

186.    As of September 18, 2024, South Dakota Medicaid had 143,290 individuals enrolled, of which approximately 12% were in a person with disabilities aid category.

187.    South Dakota Medicaid has several programs available for individuals with disabilities, including the Home & Community-Based Options, Person Centered Excellence, HOPE Waiver (in two settings) and Medical Assistance for Workers with Disabilities (MAWD). Increasing the population of potentially eligible individuals, by a number presently unknowable, would result in new unbudgeted costs in the programs.

**P.  Impact of the Final Rule on Utah.**

188.    Utah participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

**Q.  Impact of the Final Rule on West Virginia.**

189.    By including gender dysphoria within the definition of disability in the employment context, West Virginia's agencies, as employers, must expend time, money, and resources to provide reasonable accommodations for those suffering from gender dysphoria. Such accommodations might include requiring the use of employees' preferred pronouns, allowing employees to be dressed as a member of the opposite sex in violation of dress codes prohibiting unprofessional or inappropriate clothing, or allowing employees to use the other sex's bathrooms or locker rooms.

190.    If West Virginia does not provide these accommodations, it is now at risk of being subjected to investigations, charges, or lawsuits by allegedly aggrieved employees or the federal government. 42 U.S.C. §§ 2000e-5(b), (f), 2000gg-2, 2000gg-4; *see also* 42 U.S.C. §§ 2000e-6, 2000e-8, 2000e-9.  For example, West Virginia has promulgated uniform standards for certain law-enforcement personnel that say female officers' duty shirts "shall be similar in design and manufacture" to male officers' duty shirts, "except that the sizing and fit shall be specifically designed and tailored proper to the female physique and sizing"; those standards in turn list

different size schemes for men and women. *See* West Virginia's Sheriff's Bureau, Prescribed Uniform Standards (Dec. 31, 2009) https://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId= 17983&Format=PDF. The Final Rule could force the Bureau and other West Virginia's agencies to modify this and other current policies, procedures, and practices regarding dress codes and grooming and bathroom policies.

191.    The Final Rule affects West Virginia's Department of Human Services.  The Final Rule would require DHS to elevate the terms of the Final Rule over the requirements of West Virginia law when making decisions about removal, custody, and the termination of parental rights. *See* 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

192.    All these requirements impose substantial costs and injuries on West Virginia. The Final Rule itself acknowledges that States, like West Virginia, will incur annualized costs of about $563.6 million per year at a 3% discount rate and $589.8 million at a 7% discount rate. 89 Fed. Reg. at 40,178.

193.    In sum, the Final Rule imposes severe and irreparable harm on West Virginia by imposing various costs and attendant risks of administrative proceedings, investigations, lawsuits, and compliance measures.

**CLAIMS FOR RELIEF**

**Count 1**
**The Final Rule Exceeds Statutory Authority and**
**Is Not in Accordance with Law**
**5 U.S.C. § 706**

194.    All other allegations are repeated and realleged as if fully set forth herein.

195.    The Final Rule is final agency action and reviewable under the APA.

196.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

197.    The Final Rule exceeds Defendants' statutory authority when it includes "gender dysphoria" in the definition of "disability" under the ADA and the Rehabilitation Act.

198.    Both the ADA and the Rehabilitation Act explain that "the term 'disability' shall not include transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders." 42 U.S.C. § 12211(b)(1) (emphasis added); 29 U.S.C. § 705(20)(F)(i) (emphasis added).

199.    The Final Rule's definition of gender dysphoria as a disability exceeds the authority Congress granted to Defendants and is therefore unlawful, should be declared invalid, should be set aside, and in violation of the APA, 5 U.S.C. § 706(2)(C).

200.    The Final Rule also exceeds Defendants' statutory authority by obligating recipients of federal financial assistance to alter their programs and activities to ensure the provision of services in "the most integrated setting" as defined in the Final Rule.

201.    The Final Rule also exceeds Defendants' statutory authority by imposing prohibitions on actions resulting in "serious risk of institutionalization" and allowing claims of discrimination to be asserted even when no institutionalization or segregation has occurred.

202.    The Final Rule also exceeds HHS's statutory authority by directing state budgets to serve the policy priorities of a federal administrative agency.

## Count 2
### The Final Rule is Arbitrary and Capricious
### 5 U.S.C. § 706

203.    All other allegations are repeated and realleged as if fully set forth herein.

204.    The APA requires courts to set aside agency action that is "arbitrary, capricious," or an "abuse of discretion." 5 U.S.C. § 706(2)(A).

205.    "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

206.    "[A]gency action" is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent thereof, or failure to act." 5 U.S.C. § 551(13). An agency "rule" is defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." *Id.* at § 551(4).

207.    An agency action is arbitrary or capricious if it fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary and capricious." 5 U.S.C. § 706(2)(A).[5]

208.    The Final Rule is arbitrary and capricious when it states that gender dysphoria constitutes a disability.

209.    *First*, the Final Rule incorrectly relied on a single decision from the Fourth Circuit that does not even adequately support its position that gender dysphoria does not fall within the statutory exclusion under Section 504 or the ADA. The Final Rule commits the same error as the Fourth Circuit because it attempts to define gender dysphoria as a subset of gender identity disorders, but that means that gender dysphoria is included in, and cannot be separate from, unprotected gender identity disorders.

210.    *Second*, the Final Rule entirely failed to consider the Free Speech and privacy implications of requiring the use of employees' preferred pronouns, allowing employees to be dressed as a member of the opposite sex in violation of dress codes prohibiting unprofessional or inappropriate clothing, or allowing employees to use the opposite sex's bathrooms or locker rooms.

---

[5]    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained,'" and an agency must provide "'a satisfactory explanation for its action." *Ohio v. EPA*, 144 S. Ct. 2040, 2045 (2024) (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150)).

211.    *Third*, the Final Rule "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43—namely, that gender dysphoria does not result from a physical impairment. Gender dysphoria is a psychological condition that results when a person feels "discomfort" his or her biological, immutable sex, it falls within category of "transvestism, transsexualism . . . [and] gender identity disorders not resulting from physical impairments, or other sexual behavior disorders" which is *expressly* excluded from the definition of "disability" under Section 504 and the ADA. *See* 42 U.S.C. § 12211(b)(1); 29 U.S.C. § 705(20)(F)(i).

212.    Likewise, the Final Rule is arbitrary and capricious in imposing its "integration mandate" and in imposing an "at risk" theory of discrimination.

213.    First, HHS failed to conduct a meaningful inquiry into the cost to States and despite commenters notifying HHS of the financial impact to recipients, HHS simply reiterated in the Final Rule that "the Department believes that these provisions will likely result in no additional costs to recipients." 89 Fed. Reg. at 40,176.

214.    Second, HHS has created conflicting obligations and permission structures between different federal agencies. For instance, a State that takes steps to comply with CMS's cost neutrality requirements may be deemed "discriminatory" by the HHS's Office for Civil Rights.

215.    Third, HHS prevents States from innovating and improving their service delivery systems. The Final Rule requires even optional services to be provided across the board in every setting.

216.    Fourth, HHS has failed to consider or arbitrarily rejected alternative solutions to the system concerns it identified.

217.    Fifth, HHS has created a regime that is impossible for any State to fully comply with.

218.    Sixth, HHS arbitrarily rejected federal law that contradicted its policy preferences.

219.    Seventh, by codifying a policy that has been rejected by the Fifth Circuit, HHS has arbitrarily and capriciously created a federal regime that applies differently in different parts of the country.

220.    Plaintiffs submitted objections to the proposed rule with reasonable specificity and HHS failed to address or respond to these objections. HHS's response "did not address the applicants' concern so much as sidestep it." *Ohio v. EPA*, 144 S. Ct. 2040, 2046 (2024).

### Count 3
### Section 504 is Unconstitutional
### U.S. Const., art. I, § 8, cl. 1.

221.    All other allegations are repeated and realleged as if fully set forth herein.

222.    Under the Rehabilitation Act, "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

223.    The Rehabilitation Act, by its own terms, applies to all recipients of federal funds, both funds disbursed under the Act's funding mandates and any unrelated federal spending.

224.    The Rehabilitation Act therefore imposes a condition on the receipt of any and all federal money. Recipients must choose between compliance with the Act and use of *any* federal revenue.

225.    The Spending Clause grants Congress the power to "pay the Debts and provide for the common Defense and general Welfare of the United States." U.S. Const., art. I, § 8, cl. 1.

226.    When Congress exercises its spending power, principles of federalism require that conditions on federal expenditures must be (1) "unambiguous[]" so that States are able to "exercise their choice knowingly, cognizant of the consequences of their participation," (2) related to the "federal interest in the project," (3) spending must not "induce the States to engage in activities that would themselves be unconstitutional," and (4) spending must not "be so coercive as to pass the point at which 'pressure turns into compulsion.'" *South Dakota v. Dole*, 483

U.S. 203, 207–11 (1987) (quoting *Charles C. Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)).

227.    Section 504 of the Rehabilitation Act violates the principles of clear notice, relatedness, and anti-coercion.

228.    *First*, the Rehabilitation Act fails to provide clear notice to States, preventing States from voluntarily and knowingly exercising choice in accepting federal funds.

229.    Grants to States under the Spending Clause are "much in the nature of a contract." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576–77 (2012) (citing *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)). "The legitimacy of Congress's exercise of the spending power 'thus rests'"—in part—"on whether the [State] voluntarily and knowingly accepts the terms of the 'contract,'" *id.* at 577 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)), and Congress may not use federal spending "to exert a 'power akin to undue influence.'" *Id.* (quoting *Steward Machine*, 301 U.S. at 590).

230.    Any conditions on the grant of federal moneys must be imposed "unambiguously." *Pennhurst,* 451 U.S. at 17.  "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.*

231.    Section 504 attempts to retroactively modify preexisting and unrelated agreements between States and the federal government because it adds a condition to all federal grants, including grants aw under older spending legislation.

232.    Section 504's universal scope unfairly surprises States by retroactively adding conditions to pre-existing federal spending programs. The Act's conditions are not limited to federal spending that post-dates the Act's enactment; accordingly, they attach to funds distributed under federal programs that preceded the Rehabilitation Act. Retroactive spending conditions fail to provide State recipients fair opportunity to "voluntarily and knowingly accept[] the terms of" the federal grant. *Sebelius*, 567 U.S. at 577 (quotation omitted). "Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or "retroactive" conditions." *Pennhurst,* 451 U.S. at 25 (1981). Section 504's

retroactivity means that Plaintiffs could not have known they would be burdened by the Rehabilitation Act's requirements when they chose to participate in earlier federal programs.

233.     *Second,* the Rehabilitation Act fails the relatedness test. To pass constitutional muster, conditions on federal spending must be reasonably related to the "federal interest in particular national projects or programs." *Dole*, 483 U.S. at 207–08 (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978)). Relatedness is satisfied when a reasonable nexus exists between the conditions placed on state recipients and the "over-all objectives" for which Congress authorized particular federal funds. *Ivanhoe Irr. Dist. v. McCracken*, 357 U.S. 275, 295 (1958).

234.     However, by roping in *all* federal spending Section 504 fails any relatedness test imaginable. While the purpose of Section 504 is to promote employment opportunities for the disabled, the Act imposes its requirements on federal funds disbursed pursuant to legislation totally unrelated to disability.

235.     *Third,* the Rehabilitation Act is coercive spending legislation that falls afoul of the Tenth Amendment's prohibition on federal commandeering of state government. The "Constitution simply does not give Congress the ability to require the States to regulate," *New York v. United States*, 505 U.S. 144, 178 (1992), and because that is so, federal legislation that forces an impossible choice on States or that surprises States with *ex post facto* conditions "undermine[s] the status of the States as independent sovereigns in our federal system." *Sebelius*, 567 U.S. at 577. When "pressure turns into compulsion, [that] legislation runs contrary to our system of federalism." *Id.* at 578 (quotation omitted).

236.     By enacting Section 504, 29 U.S.C. § 794, Congress "crossed the line distinguishing encouragement from coercion." *New York*, 505 U.S. at 175. Section 504 applies with extreme breadth to "any program or activity receiving Federal financial assistance," meaning that every recipient of any amount of federal money allocated under any statutory scheme must comply with the Rehabilitation Act and regulations promulgated under it.

237.    Thus, the Texas Department of Agriculture must—per the Act's terms—ensure compliance with Section 504 despite receiving no funds pursuant to the Act or any other federal legislation related to disability.

238.    Because the Act attaches its requirements universally—to all federal spending—it forces an impossible choice on the States, all of which must decide between implementing the Rehabilitation Act and accepting *any* amount of federal money. When spending "conditions take the form of threats to terminate other significant independent grants," they "are properly viewed as a means of pressuring the State to accept policy changes." *Sebelius*, 547 U.S. at 580. Section 504's universal scope renders it an unconstitutionally coercive condition on federal spending.

239.    Because Section 504 is coercive, untethered to the federal interest in disability, and unfairly retroactive, the Rehabilitation Act is not constitutional under the spending clause.

240.    The constitutional violation posed by invalid spending legislation can be remedied by injunctive relief that precludes relevant federal officials from withdrawing funds for incompliance. *Sebelius*, 567 U.S. at 588.

**Count 4**
**The Final Rule is Unconstitutional**
**5 U.S.C. § 706**

241.    All other allegations are repeated and realleged as if fully set forth herein.

242.    A federal agency has no power to act on its own, without authority delegated by Congress. *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986).

243.    Congress must unambiguously specify the conditions it attaches to federal grants to States so that States can "clearly understand" from statutory language the terms on which they accept federal funding. *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

244.    The APA requires courts to set aside and vacate agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B); *see also id.* § 706(2)(A).

245.    Conditions on federal spending are unconstitutional when they "cross[] the line distinguishing encouragement from coercion." *New York*, 505 U.S. at 175. Moreover, Congress

exceeds its spending clause powers by "surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25.

246.    The Final Rule unfairly surprises state recipients by newly extending Section 504's disability protections to gender dysphoria and by redefining Section 504 to include the newly formulated "integration mandate" and "at risk" theory of discrimination. Since Section 504 is a condition on federal grants, the Final Rule therefore subjects States to significant new conditions on federal spending.

247.    Section 504 applies to all federal funds with no limit, so the Final Rule forces States to choose between a ruinous withdrawal of federal funding and compliance with the new protections. This is an impossible choice, and the Final Rule is unconstitutionally coercive for forcing it on the States.

248.    Because the Final Rule's new requirements cannot be gleaned from the plain language of the Rehabilitation Act, the Rule unfairly surprises States with conditions they could not have "voluntarily and knowingly" agreed to. HHS may not regard the Act as the source of hidden conditions that the States unwittingly signed off on when they accepted federal money.

249.    Accordingly, the Final Rule violates the Spending Clause and is therefore contrary to constitutional right.

### DECLARATORY JUDGMENT

250.    The federal Declaratory Judgment Act authorizes federal courts to declare the rights of litigants. 28 U.S.C. § 2201. The issuance of a declaratory judgment can serve as the basis for an injunction to give effect to the declaratory judgment. *Steffel v. Thompson*, 415 U.S. 452, 461 n.11 (1974).

251.    For the reasons described above, Plaintiffs are entitled to a declaration that the Final Rule exceeds statutory authority and is therefore unlawful and void and that Section 504 violates the Spending Clause.

## DEMAND FOR RELIEF

Plaintiffs respectfully request that the Court:

a.  Issue permanent injunctive relief against Defendants enjoining them from enforcing the Final Rule;

b.  Declare that the Final Rule violates the Administrative Procedure Act;

c.  Hold unlawful and set aside (*i.e.*, vacate) the Final Rule;

d.  Declare Section 504, 29 U.S.C. § 794, unconstitutional;

e.  Issue permanent injunctive relief against Defendants enjoining them from enforcing Section 504;

f.  Award attorneys' fees and costs incurred in this action to Plaintiffs;

g.  Issue any and all other relief to Plaintiffs the Court deems just and proper.

Dated: September 26, 2024.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Legal Strategy

Respectfully submitted,

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
Texas State Bar No. 24105085
ryan.walters@oag.texas.gov

JACOB E. PRZADA
Special Counsel
Texas State Bar No. 24125371
jacob.przada@oag.texas.gov

KYLE S. TEBO
Special Counsel
Texas State Bar No. 24137691
kyle.tebo@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

COUNSEL FOR STATE OF TEXAS

TREG TAYLOR
Attorney General of Alaska

*/s/ Christopher A. Robison*
CHRISTOPHER A. ROBISON
Alaska Bar No. 2111126
Texas Bar No. 24035720

LAURA O. RUSSELL*
Alaska Bar No. 1311106

Assistant Attorneys General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
Telephone: (907) 269-5100
chris.robison@alaska.gov
laura.russell@alaska.gov

COUNSEL FOR ALASKA
*Pro Hac Vice Application forthcoming

STEVE MARSHALL
Attorney General of Alabama

*/s/ Edmund G. LaCour Jr.*
EDMUND G. LACOUR JR.
Solicitor General
Office of the Attorney General of Alabama
501 Washington Avenue
Montgomery, Alabama 36130
Telephone: (334) 242-7300
edmund.lacour@alabamaag.gov

COUNSEL FOR ALABAMA

TIM GRIFFIN
Attorney General of Arkansas

/s/ Nicholas J. Bronni
NICHOLAS J. BRONNI
Solicitor General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
nicholas.bronni@arkansasag.gov

COUNSEL FOR ARKANSAS

ASHLEY MOODY
Attorney General of Florida

s/ James Percival
JAMES H. PERCIVAL*
Chief of Staff
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Telephone:  (850) 414-3300
Facsimile:   (850) 410-2672
james.percival@myfloridalegal.com

COUNSEL FOR FLORIDA
*Pro Hac Vice Application forthcoming

CHRISTOPHER M. CARR
Attorney General of Georgia

/s/ Stephen J. Petrany
STEPHEN J. PETRANY*
Solicitor General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

COUNSEL FOR GEORGIA
*Pro Hac Vice Application forthcoming

THEODORE E. ROKITA
Attorney General of Indiana

/s/ James A. Barta
JAMES A. BARTA*
Solicitor General
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, Indiana 46204
(317) 232-0709
james.barta@atg.in.gov

COUNSEL FOR INDIANA
*Pro Hac Vice Application forthcoming

BRENNA BIRD
Attorney General of Iowa

/s/ Eric H. Wessan
ERIC H. WESSAN
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

COUNSEL FOR IOWA

KRIS KOBACH
Attorney General of Kansas

/s/ Abhishek Kambli
ABHISHEK KAMBLI*
20 SW 10th Ave, 2nd Floor,
Topeka, Kansas 66612-1597
Telephone: (785) 296-2215
abhishek.kambli@ag.ks.gov

COUNSEL FOR KANSAS
*Pro Hac Vice Application forthcoming

ELIZABETH B. MURRILL
Attorney General of Louisiana

*s/ J. Benjamin Aguiñaga*
**J. BENJAMIN AGUIÑAGA\***
Solicitor General
Office of the Attorney General
1885 N. 3rd St.
Baton Rouge, Louisiana 70802
Telephone:    (225) 506-3746
aguinagab@ag.louisiana.gov

**COUNSEL FOR LOUISIANA**
*Pro Hac Vice Application forthcoming*

ANDREW BAILEY
Attorney General of Missouri

/s/ *Josh Divine*
**JOSH DIVINE**
Solicitor General
Office of the Attorney General
815 Olive St., Suite 200
St. Louis, Missouri 63188
josh.divine@ago.mo.gov

**COUNSEL FOR MISSOURI**

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ Christian B. Corrigan*
**CHRISTIAN B. CORRIGAN\***
Solicitor General
**PETER M. TORSTENSEN, JR.\***
Deputy Solicitor General
Montana Department of Justice
215 N. Sanders Street
Helena, Montana 59601
Telephone: (406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

**COUNSEL FOR MONTANA**
*Pro Hac Vice Application forthcoming*

MICHAEL T. HILGERS
Attorney General of Nebraska

*/s/ Grant D. Strobl*
**GRANT D. STROBL**
Assistant Solicitor General
2115 State Capitol
Lincoln, NE 68509
Telephone: (531) 207-3853
grant.strobl@nebraska.gov

**COUNSEL FOR NEBRASKA**

ALAN WILSON
Attorney General of South Carolina

*s/ J. Emory Smith, Jr.*
**JAMES EMORY SMITH, JR.\***
Deputy Solicitor General
Office of the Attorney General
PO Box 11549
Columbia, South Carolina 29211
Telephone:   (803) 734-3642
Facsimile:    (803) 734-3677
esmith@scag.gov

**COUNSEL FOR SOUTH CAROLINA**
*Pro Hac Vice Application forthcoming*

MARTY JACKLEY
Attorney General of South Dakota

*/s/ Aaron Salberg*
**AARON SALBERG\***
Assistant Attorney General
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501
Telephone:   (605) 773-3215
aaron.salberg@state.sd.us

**COUNSEL FOR SOUTH DAKOTA**
*Pro Hac Vice Application forthcoming*

SEAN D. REYES
Attorney General of Utah

*/s/ Scott St. John*
SCOTT ST. JOHN*
Office of the Attorney General
PO Box 142320
Salt Lake City, Utah 84114-2320
scottstjohn@agutah.gov

COUNSEL FOR UTAH
*Pro Hac Vice Application forthcoming*

PATRICK MORRISEY
Attorney General of West Virginia

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS*
State Capitol Complex, Bldg. 1, Rm E-26
1900 Kanawha Blvd. E
Charleston, West Virginia 25305
Telephone: (681)-313-4511
Facsimile: (304) 558-0140
michael.r.williams@wvago.gov

COUNSEL FOR WEST VIRGINIA
*Pro Hac Vice Application forthcoming*