## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

STATE OF TEXAS,
STATE OF ALASKA,
STATE OF FLORIDA,
STATE OF INDIANA,
STATE OF KANSAS,
STATE OF LOUISIANA,
STATE OF MISSOURI,
STATE OF MONTANA, and
STATE OF SOUTH DAKOTA,

     *Plaintiffs*,

v.

ROBERT F. KENNEDY JR., in his official
capacity as Secretary of Health and Human
Services; UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

     *Defendants*.

CASE NO. 5:24-CV-00225

---

## FIRST AMENDED
## COMPLAINT

---

1.     On May 9, 2024 the Biden Administration finalized a new rule that upends decades of federal disability law by (1) obligating all recipients of federal financial assistance to provide services in "the most integrated setting," as defined in the Final Rule; (2) prohibiting actions that result in "serious risk of institutionalization"; and (3) allowing discrimination claims to be brought when no institutionalization or segregation has actually occurred. *Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 40,066, 40,068–69 (May 9, 2024) ("Final Rule"). The Final Rule exceeds the legitimate scope of Section 504 of the Rehabilitation Act and the Americans with Disabilities Act ("ADA") and thereby exposes Texas, Alaska, Florida, Indiana, Kansas, Louisiana, Missouri, Montana, and South Dakota, and their agencies to the loss of federal funding.

2.      The Final Rule's unlawful provisions regulating institutionalization should be set aside for exceeding the scope of HHS's authority under Section 504 and the ADA. Neither statute empowers HHS to mandate community-based care or to regard as discriminatory care that involves the mere prospect of institutional care. Short of "unjustified institutional isolation," Section 504 and the ADA leave the States free to decide how best to care for their disabled citizens. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600, 612-13 (1999). As the Fifth Circuit concluded just two years ago, "[n]othing in the text of Title II . . . suggests that risk of institutionalization . . . constitutes actionable discrimination." *United States v. Mississippi*, 82 F.4th 387, 398 (5th Cir. 2023).

3.      Similarly, the Final Rule surprises state recipients of federal funds by imposing its new requirements as conditions on federal spending. This violates the Spending Clause, and the Rule is therefore contrary to constitutional right.

4.      The Final Rule should also be set aside as arbitrary and capricious because, *inter alia*, (1) HHS has created conflicting obligations and permission structures between different federal agencies; (2) the Rule prevents States from innovating and improving their service delivery systems; (3) it creates a regime that is impossible for any State to fully comply with; (4) HHS failed to consider alternative solutions to the system concerns it identified; and (5) HHS summarily rejected federal law that contradicts its policy preferences.

### PARTIES

5.      Plaintiff Texas is a sovereign State of the United States.

6.      Plaintiff Alaska is a sovereign State of the United States.

7.      Plaintiff Florida is a sovereign State of the United States.

8.      Plaintiff Indiana is a sovereign State of the United States.

9.      Plaintiff Kansas is a sovereign State of the United States.

10.     Plaintiff Louisiana is a sovereign State of the United States.

11.     Plaintiff Missouri is a sovereign State of the United States.

12.     Plaintiff Montana is a sovereign State of the United States.

13.     Plaintiff South Dakota is a sovereign State of the United States.

14.     Defendant Robert F. Kennedy Jr. is the Secretary of the Department of Health and Human Services. He is sued in his official capacity.

15.     Defendant the United States Department of Health and Human Services is the executive agency of the federal government that promulgated and now enforces the Final Rule.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1361.

17.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702, 703, and 706; 8 U.S.C. §§ 1361, 2201, and 2202; and the Court's inherent equitable powers.

18.     Venue lies in this district under 28 U.S.C. § 1391(e)(1) because an agency of the United States is a defendant, and because Texas resides in every judicial district and division within its borders, including this one. *See*, *e.g.*, *Utah v. Walsh*, 2:23-cv-16, 2023 WL 2663256, at *3 (N.D. Tex. Mar. 28, 2023) (Kacsmaryk, J.) ("Texas resides everywhere in Texas.").

## FACTUAL AND LEGAL BACKGROUND

### I.    The Rehabilitation Act

19.     Congress passed the Rehabilitation Act in 1973, and Section 504 of the Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Section 504 applies specifically to: (1) programs receiving federal funds, (2) executive agencies, and (3) the United States Postal Service. 29 U.S.C. § 794.

20.     Section 504 applies broadly—it prohibits "any program or activity" that receives federal financial assistance from discriminating against a qualified individual with a disability. 29 U.S.C. § 794(a). And "program or activity" includes all the operations of:

3

    (1)    a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

    (2)    the entity of such State or local government that distributes such assistance and each such department of agency (and each other State of local government entity) to which the assistance is extended, in the case of assistance to a State or local government; . . . any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b).

21.    While Congress has amended Section 504 on multiple occasions, Congress has never affirmatively required recipients to create entire new systems of care or subordinate state policy and fiscal judgments to the federal government.

22.    Nor has Congress expressly delegated authority to allow administrative agencies to enact these requirements. "Any interpretation of § 504 must therefore be responsive to two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds." *Alexander v. Choate*, 469 U.S. 287, 299 (1985).

## II.   The Americans with Disabilities Act

23.    The Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq., was enacted in 1990 and has similar provisions that are interpreted in tandem with Section 504. The ADA explicitly states that "[e]xcept as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard" than Section 504 and regulations issued by federal agencies pursuant to Section 504. 42 USC § 12201(a). But the ADA applies to a broader swath of entities than Section 504 because it is not tied to receipt of federal funds.

24.    Under the ADA, a covered entity[1] cannot "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring,

---

[1] A covered entity includes "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). Because Texas, Alaska, Florida, Indiana, Kansas, Louisiana, Missouri, Montana, and South Dakota are employers, they constitute "covered entit[ies]" under the ADA.

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

### III.    The Rehabilitation Act and the ADA share a definition of "disability."

25.    The Americans with Disabilities Act defines "disability" as an individual with (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1).

26.    A "qualified individual" is defined as "handicapped individual who meets eligibility requirements relevant to the receipt of services provided in the program or activity." 29 C.F.R. § 32.3 (implementing the Rehabilitation Act).

27.    Section 504 incorporates the ADA's definition of "disability." 29 U.S.C. §§ 705(9)(B), (20)(B) for certain purposes.

28.    For the purposes of this lawsuit, the term "disability" is identical in the Rehabilitation Act and the ADA.

### IV.    The Medicaid Program

29.    Medicaid is a health insurance program for needy individuals which is administered by states according to federal requirements and is funded jointly by States and the federal government.

30.    Participation in Medicaid is not mandatory, but States that choose to participate must meet federal requirements.

31.    The *federal* Medicaid rules favor institutional and medical-model care. Since its inception, Medicaid has paid for care through a medical and institutional care model, not through a community-based model.

32.    While Congress has created options for States to seek "waivers" of normal Medicaid rules in order to expand services in community settings, 42 U.S.C. § 1396n, States are required to go through lengthy, expensive, and cumbersome application and renewal processes to implement these waivers.

33.     The Centers for Medicare & Medicaid Services (CMS) is an administrative agency within the Department of Health and Human Services.

34.     CMS has oversight of Medicaid and Medicaid waiver programs. To receive approval for a waiver, a State must prove to CMS that the average annual cost of waiver services will not exceed that of institutional services. This concept is known as "cost neutrality." Capping enrollment in a waiver program is a common and accepted method of achieving the required cost neutrality.

## The Final Rule

35.     Defendants published the Final Rule to "amend[] [HHS's] existing section 504 regulation on nondiscrimination obligations for recipients of Federal financial assistance." 89 Fed. Reg. 40,066.

36.     The Final Rule incorporates the enforcement mechanisms under Title I of the ADA, 42 U.S.C. §§ 12111 et seq., 89 Fed. Reg. at 40,185 (codified at 45 C.F.R. § 84.16(b). In turn, Title I adopts the powers, remedies, and procedures of Title VII of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000e-4, et seq.

37.     As a result, an aggrieved employee may file a charge with EEOC against his employer. 42 U.S.C. §§ 2000e-5(b), 2000gg-2, 2000gg-4. The EEOC will then investigate the charges and seek a conciliation agreement. 42 U.S.C. §§ 2000e-5(b), (f); *see also* 42 U.S.C. §§ 2000e-8; 42 U.S.C. §§ 2000e-9. If no agreement is reached, EEOC will either bring a civil action against an employer or decline and issue a notice to the employee of his right to sue. 42 U.S.C. § 2000e-5(f). In the case of a government employer, once conciliation fails, EEOC refers the case to the Attorney General who can bring suit or issue a right-to-sue notice to the employee. *Id*. Besides individual charges, the Attorney General is authorized to bring a civil action against an employer based on "a pattern or practice of resistance." 42 U.S.C. §§ 2000e-6.

38.     The Final Rule also applies to the child welfare system. The Final Rule specifically states that "[n]o qualified individual with a disability shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under

any child welfare program or activity that receives Federal financial assistance." 89 Fed. Reg. at 40,188 (codified at 45 C.F.R. § 84.60(a)(1)).

39.     According to the Final Rule, such discrimination includes (1) "[d]ecisions based on speculation, stereotypes, or generalizations that a parent, caregiver, foster parent, or prospective parent, because of a disability, cannot safely care for a child;" and (2) "[d]ecisions based on speculation, stereotypes, or generalizations about a child with a disability." 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

40.     Further the Final Rule requires such a recipient—whether directly or through contracts, agreements, or other arrangements—to not (1) "[d]eny a qualified parent with a disability custody or control of, or visitation to, a child;"(2) "[d]eny a qualified parent with a disability an opportunity to participate in or benefit from any and all services provided by a child welfare agency, including but not limited to, family preservation and reunification services equal to that afforded to persons without disabilities;" (3) "[t]erminate the parental rights or legal guardianship of a qualified individual with a disability;" (4) "[d]eny a qualified caregiver, foster parent, companion, or prospective parent with a disability the opportunity to participate in or benefit from child welfare programs and activities;" or (5) "[r]equire children, on the basis on the disability, to be placed outside the family home through custody relinquishment, voluntary placement, or other forfeiture of parental rights in order to receive necessary services." 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(b)(1)–(5)).

41.     The Final Rule's requirements for each of these various contexts shows how broad an impact the Rule is poised to inflict on the States.

**V.    HHS's "integration mandate" exceeds statutory authority and conflicts with federal law.**

42.     The Final Rule adds a mandate for "integration" which requires every "recipient" of "federal financial assistance" "administer a program or activity in the most integrated setting appropriate to the needs of a qualified person with a disability." 89 Fed. Reg. at 40,192.

43.    The Final Rule defines "recipient" as

any State or its political subdivision, any instrumentality of a State or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance.

89 Fed. Reg. at 40,184.

44.    The Final Rule defines "federal financial assistance" as

any grant, cooperative agreement, loan, contract (other than a direct Federal procurement contract or a contract of insurance or guaranty), subgrant, contract under a grant or any other arrangement by which the Department provides or otherwise makes available assistance in the form of: (1) Funds; (2) Services of Federal personnel; (3) Real and personal property or any interest in or use of such property, including: (i) Transfers or leases of such property for less than fair market value or for reduced consideration; and (ii) Proceeds from a subsequent transfer or lease of such property if the Federal share of its fair market value is not returned to the Federal Government; And (4) *Any other thing of value* by way of grant, loan, contract, or cooperative agreement.

89 Fed. Reg. at 40,183 (emphasis added).

45.    The Final Rule defines "most integrated setting" as

a setting that provides individuals with disabilities the opportunity to interact with nondisabled persons to the fullest extent possible. These settings provide opportunities to live, work, and receive services in the greater community, like individuals without disabilities; are located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; and afford individuals choice in their daily life activities.

89 Fed. Reg. at 40,183.

46.    Anything short of that is considered "segregated" and therefore discriminatory. And the obligation to provide a specific service in a community setting is practically limitless, no matter how specialized, and regardless of whether a specific service is designed for a non-community setting.

### A. The Final Rule mischaracterizes *Olmstead.*

47.    In imposing the "integration mandate," HHS claims to be codifying "longstanding case law" and cites specifically to the *Olmstead* case for its proposition that "covered entities" must "serve individuals with disabilities in the most integrated setting appropriate to their needs." 89 Fed. Reg. at 40,117. But what is required by the Final Rule goes well beyond even the most liberal reading of *Olmstead*.

48.    In *Olmstead*, two individuals in a psychiatric institution who could have been served in a less restrictive setting sued Georgia under the ADA and its implementing regulations, challenging their continued institutionalization.[2] *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).

49.    While the Court held unnecessary institutionalization could constitute discrimination under the ADA, the plurality's decision was tightly cabined. The Court held that unnecessary institutionalization only constitutes discrimination when:

  i.    the State's treatment professionals determine that community-based treatment is appropriate,

  ii.    the affected persons do not oppose such treatment, and

  iii.    the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.[3]

*Id.* at 607.

50.    The Court was also careful to recognize the important role the States play in treating individuals with disabilities, and it emphasized that its holding did not require States to create new programs out of whole cloth. Justice Kennedy, casting the decisive fifth vote, explained:

> Of course, it is a quite different matter to say that a State without a program in place is required to create one. No State has unlimited resources, and

---

[2] The ADA regulations in that case were not in themselves held valid, as the Court expressly refrained from deciding a question not raised by the parties. *Olmstead*, 527 U.S. at 592.

[3] The latter language—"taking into account the resources available to the State and the needs of others with mental disabilities"—is a formulation of the fundamental alteration defense. States are required only to make *reasonable* modifications and cannot be required to make modifications that "would fundamentally alter the nature of the service, program, or activity." *Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 618 (9th Cir. 2005).

> each must make hard decisions on how much to allocate to treatment of diseases and disabilities. If, for example, funds for care and treatment of the mentally ill, including the severely mentally ill, are reduced in order to support programs directed to the treatment and care of other disabilities, the decision may be unfortunate. The judgment, however, is a political one and not within the reach of the statute.

*Olmstead*, 527 U.S. at 612–13 (Kennedy, J., concurring) (emphasis added).

51.    Here, the Final Rule, despite purporting to be consistent with *Olmstead*, removes those political judgments from the hands of the States by requiring them to design (or redesign) their systems and programs, for all individuals with disabilities, to eliminate "practices that result in . . . serious risk of institutionalization." 89 Fed. Reg. at 40,192. And the Final Rule apparently gave no thought to whether that result was even achievable, or how much it might cost.

52.    For some individuals, placement in a community setting is inappropriate and will fail to meet their level of need. As noted by Justice Kennedy, the congressional findings underlying the ADA "do not show that segregation and institutionalization are always discriminatory or that segregation or institutionalization are, by their nature, forms of prohibited discrimination." *Id.* at 614.

53.    The Final Rule's mandate realizes the very concerns articulated by Justice Kennedy:

> It would be unreasonable, it would be a tragic event, then, were the Americans with Disabilities Act of 1990 (ADA) to be interpreted so that [S]tates had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision.

*Id.* at 610.

## B. Defendants' "at risk" theory exceeds their statutory authority and conflicts with federal law.

54.    The Final Rule also codifies the "at-risk" theory of discrimination, whereby individuals who are not actually institutionalized or even facing imminent institutionalization can bring a claim for discrimination based on the notion that the distribution of resources within a

State's system of care somehow places them "at serious risk of institutionalization." 89 Fed. Reg. at 40,120–21, 40,192.

55.    This theory is described in a 2020 Department of Justice (DOJ) guidance document that serves as a structural pillar to this Final Rule and for litigation brought by DOJ against various States:

> the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings. Individuals need not wait until the harm of institutionalization or segregation occurs or is imminent. For example, a plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services or its cut to such services will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution.

*Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.,* https://www.ada.gov/resources/olmstead-mandate-statement/ (last visited Sep. 19, 2024) (emphasis added).

56.    But both the DOJ guidance document and the Final Rule are directly contrary to Fifth Circuit authority issued just a week after Defendants' Notice of Proposed Rulemaking for the Final Rule.

57.    On September 20, 2023, the Fifth Circuit expressly rejected the "at risk" theory underpinning much of the Proposed Rule and litigation brought by the DOJ under the ADA. The court explained: "Nothing in the text of Title II, its implementing regulations, or *Olmstead* suggests that risk of institutionalization, without actual institutionalization, constitutes actionable discrimination." *United States v. Mississippi*, 82 F.4th 387, 398 (5th Cir. 2023).

58.    Nevertheless, Defendants claims the Final Rule is consistent with "major legislative and judicial developments." 89 Fed. Reg. at 40,066. When confronted with the Fifth Circuit decision, Defendants summarily dismissed this Circuit's precedent as mere "dicta." 89 Fed. Reg. at 40,120.

59.     Ignoring the Fifth Circuit's decision, the Final Rule cites to "consensus in circuit courts" and "affirms its decision to codify the 'at serious risk of institutionalization' principle." 89 Fed. Reg. at 40,120.

60.     Despite receiving comments from those concerned about the vague and undefined standards for determining who is "at risk" of institutionalization, Defendants explicitly refused to provide States with the rules of the game, declining to include in the Final Rule the "parameters of the inquiry into 'serious risk.'" 89 Fed. Reg. at 40,121.

## VI.    The Final Rule exposes States to withdrawal of federal funding, jeopardizes medical assistance programs, and penalizes States that act in compliance with requirements from other federal agencies.

61.     What States are left with, then, is a broad and nebulous requirement to provide unlimited community-based services in every setting to eliminate institutionalization (regardless of whether it is appropriate in a given case) or even any serious risk of institutionalization (regardless of whether that risk is ever imminent or realized). The Final Rule asserts that a State's "planning, service system design, funding, or service implementation practices" may be discriminatory if they do not eliminate the serious risk of institutionalization. 89 Fed. Reg. at 40,192.

62.     The Final Rule requires States to do whatever it takes to achieve HHS's vision, no matter the cost or impact on state operations, with the federal government micromanaging down to a personnel level (the Final Rule notes that if a workforce shortage affects a State, the State must "address staffing shortages through pay rates, recruitment and retention incentives, flexible scheduling such as split shifts, or other actions."). 89 Fed. Reg. at 40,122.

63.     States are even penalized for improving service offerings—the Final Rule asserts that when an optional benefit is "provided in institutions or other segregated settings as part of the recipient's program, the same or a substantially similar benefit must be offered in an integrated setting in a manner that does not incentivize institutional or other segregated services over community services." 89 Fed. Reg. at 40,121.

64.     The Final Rule requires recipients to allow "a qualified individual with a disability the opportunity to participate in programs or activities that are not separate or different, *despite the existence of permissibly separate or different* programs or activities." 89 Fed. Reg. at 40,189 (emphasis added).

## VII.     The Final Rule harms the States.

### A.  Impact of the Final Rule on Texas

65.     Texas participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

66.     Texas participates in the Medicaid program and must comply with strict rules and regulations set by CMS.

67.     Medicaid accounts for a significant portion of Texas's state budget.

68.     CMS rules include constraints on the State's ability to change or increase reimbursement rates for providers, such as the "upper payment limit."

69.      The range of services available through Medicaid depends on a variety of factors, many of which are beyond Texas's control, including the extent to which provider workforce exists, where providers are willing and able to open and sustain a practice, and whether providers opt in to accepting Medicaid reimbursement by enrolling with the state as a Medicaid provider.

70.     Texas cannot require every Medicaid provider to expand services to the "most integrated setting" described in the Final Rule.

71.     Eradicating wait lists for waiver services would eliminate a primary mechanism for controlling costs.

72.     CMS rules do not allow the aggregate waiver amount to exceed the cost of nursing home or institutional care.

73.     Compliance with the Final Rule would jeopardize Texas's compliance with CMS rules that are necessary for participation in the Medicaid program.

74.    The Final Rule requires the State to ensure that every recipient of Medicaid funding also complies with the Final Rule. "Recipients retain responsibility for ensuring that entities to which they provide significant assistance comply with section 504." 89 Fed. Reg. at 40,109.

75.    The Final Rule imposes requirements that are not achievable for providers and thus increases the likelihood that providers will choose not to participate in Medicaid, which would reduce the level of services available to individuals with disabilities.

76.    Implementation of Medicaid waivers is optional for States.

77.    The Final Rule's requirement that all optional benefits must be provided in "integrated settings" disincentivizes Texas from offering optional benefits.

78.    Like many areas of the country, Texas is experiencing significant workforce shortages which affect availability of services.

79.    Compliance with the Final Rule would require Texas's legislature to subordinate other legitimate state interests to compliance with the Final Rule.

80.    The Final Rule would require the State's healthcare authority to elevate the terms of the Final Rule over the requirements of Texas law when making decisions about removal, custody, and the termination of parental rights. *See* 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

81.    Compliance with the Final Rule would require Texas to expend a vast, yet indeterminate amount of general funds to provide the services required.

82.    All these requirements impose substantial costs and injuries on Texas. The Final Rule itself acknowledges that States, like Texas, will incur annualized costs of about $563.6 million per year at a 3% discount rate and $589.8 million at a 7% discount rate. 89 Fed. Reg. at 40,178.

83.    Compliance with the Final Rule would require fundamentally altering the State's systems, programs, and activities as well as its sovereign administration of the State.

84.    Therefore, the Final Rule causes irreparable and severe harm to Texas and its citizens.

14

### B. Impact of the Final Rule on Alaska

85.    Alaska participates in the Medicaid program and must comply with strict rules and regulations set by CMS.

86.    Medicaid accounts for a significant portion of Alaska's state budget.

87.    CMS rules include constraints on the State's ability to change or increase reimbursement rates for providers, such as the "upper payment limit."

88.    The range of services available through Medicaid depends on a variety of factors, many of which are beyond Alaska's control, including the extent to which provider workforce exists, where providers are willing and able to open and sustain a practice, and whether providers opt in to accepting Medicaid reimbursement by enrolling with the state as a Medicaid provider.

89.    Alaska has a unique tribal health system integral to its system of care that is operated by sovereign tribal nations.

90.    Tribal providers participate in Medicaid but are paid on an "encounter" rate which is set annually by the federal government. The State does not determine this rate.

91.    Alaska cannot require tribal entities to offer specific services in compliance with the Final Rule, though the Final Rule would require the State as a "recipient" to ensure that all entities it directs HHS funding to also comply with the Final Rule.

92.    Alaska's unique frontier geography and demographic characteristics make it impossible to provide every service in every community setting. For example, 86% of Alaska's communities cannot be reached by road, which presents a unique challenge not faced by any other State.

93.    Alaska cannot require every Medicaid provider to expand services to the "most integrated setting" described in the Final Rule.

94.    Alaska has implemented six Medicaid waivers to increase the availability of community medical and behavioral health services. Two of these waivers have enrollment caps that were approved by CMS.

95.     Eradicating wait lists for waiver services would eliminate a primary mechanism for controlling costs.

96.     CMS rules do not allow the aggregate waiver amount to exceed the cost of nursing home or institutional care.

97.     Compliance with the Final Rule would jeopardize Alaska's compliance with CMS rules that are necessary for participation in the Medicaid program.

98.     The Final Rule requires the State to ensure that every recipient of Medicaid funding also complies with the Final Rule. "Recipients retain responsibility for ensuring that entities to which they provide significant assistance comply with section 504." 89 Fed. Reg. at 40,109.

99.     The Final Rule imposes requirements that are not achievable for providers, and thus increases the likelihood that providers will choose not to participate in Medicaid, which would reduce the level of services available to individuals with disabilities.

100.    Implementation of Medicaid waivers is optional for States.

101.    The Final Rule's requirement that all optional benefits must be provided in "integrated settings" disincentivizes Alaska from offering optional benefits.

102.    Like many areas of the country, Alaska is experiencing significant workforce shortages which affect availability of services.

103.    Alaska has a population of less than 750,000 people. It is not fiscally feasible for its system of care to provide all services across the State in the Final Rule's definition of the most integrated setting in every instance.

104.    Compliance with the Final Rule would require Alaska's legislature to subordinate other legitimate state interests to compliance with the Final Rule.

105.    The Final Rule would require the State's healthcare authority to elevate the terms of the Final Rule over the requirements of Alaska law when making decisions about removal, custody, and the termination of parental rights. *See* 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

106.    Compliance with the Final Rule would require Alaska to expend a vast, yet indeterminate amount of general funds to provide the services required.

107.    Compliance with the Final Rule would require fundamentally altering the State's systems, programs, and activities as well as its sovereign administration of the State.

108.    All these requirements impose substantial costs and injuries on Alaska. The Final Rule itself acknowledges that States, like Alaska, will incur annualized costs of about $563.6 million per year at a 3% discount rate and $589.8 million at a 7% discount rate. 89 Fed. Reg. at 40,178.

109.    Therefore, the Final Rule causes irreparable and severe harm to Alaska and its citizens.

### C.  Impact of the Final Rule on Florida.

110.    Florida participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

111.    Florida participates in the Medicaid program and must comply with strict rules and regulations set by CMS.

112.    Medicaid accounts for a significant portion of Florida's state budget.

113.    CMS rules include constraints on the State's ability to change or increase reimbursement rates for providers, such as the "upper payment limit."

114.     The range of services available through Medicaid depends on a variety of factors, many of which are beyond Florida's control, including the extent to which provider workforce exists, where providers are willing and able to open and sustain a practice, and whether providers opt in to accepting Medicaid reimbursement by enrolling with the state as a Medicaid provider.

115.    Florida cannot require every Medicaid provider to expand services to the "most integrated setting" described in the Final Rule.

116.    Eradicating wait lists for waiver services would eliminate a primary mechanism for controlling costs.

117.    CMS rules do not allow the aggregate waiver amount to exceed the cost of nursing home or institutional care.

118.    Compliance with the Final Rule would jeopardize Florida's compliance with CMS rules that are necessary for participation in the Medicaid program.

119.    The Final Rule requires the State to ensure that every recipient of Medicaid funding also complies with the Final Rule. "Recipients retain responsibility for ensuring that entities to which they provide significant assistance comply with section 504." 89 Fed. Reg. at 40,109.

120.    The Final Rule imposes requirements that are not achievable for providers and thus increases the likelihood that providers will choose not to participate in Medicaid, which would reduce the level of services available to individuals with disabilities.

121.    Implementation of Medicaid waivers is optional for States.

122.    The Final Rule's requirement that all optional benefits must be provided in "integrated settings" disincentivizes Florida from offering optional benefits.

123.    Like many areas of the country, Florida is experiencing significant workforce shortages which affect availability of services.

124.    Compliance with the Final Rule would require Florida's legislature to subordinate other legitimate state interests to compliance with the Final Rule.

125.    The Final Rule would require the State's healthcare authority to elevate the terms of the Final Rule over the requirements of Florida law when making decisions about removal, custody, and the termination of parental rights. *See* 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

126.    Compliance with the Final Rule would require Florida to expend a vast, yet indeterminate amount of general funds to provide the services required.

127.    All these requirements impose substantial costs and injuries on Florida. The Final Rule itself acknowledges that States, like Florida, will incur annualized costs of about $563.6 million per year at a 3% discount rate and $589.8 million at a 7% discount rate. 89 Fed. Reg. at 40,178.

128.    Compliance with the Final Rule would require fundamentally altering the State's systems, programs, and activities as well as its sovereign administration of the State.

129.    Therefore, the Final Rule causes irreparable and severe harm to Florida and its citizens.

**D. Impact of the Final Rule on Indiana.**

130.    Indiana participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

131.    Indiana participates in the Medicaid program and must comply with strict rules and regulations set by CMS.

132.    Medicaid accounts for a significant portion of Indiana's state budget.

133.    CMS rules include constraints on the State's ability to change or increase reimbursement rates for providers, such as the "upper payment limit."

134.    The range of services available through Medicaid depends on a variety of factors, many of which are beyond Indiana's control, including the extent to which provider workforce exists, where providers are willing and able to open and sustain a practice, and whether providers opt in to accepting Medicaid reimbursement by enrolling with the state as a Medicaid provider.

135.    Indiana cannot require every Medicaid provider to expand services to the "most integrated setting" described in the Final Rule.

136.    Eradicating wait lists for waiver services would eliminate a primary mechanism for controlling costs.

137.    CMS rules do not allow the aggregate waiver amount to exceed the cost of nursing home or institutional care.

138.    Compliance with the Final Rule would jeopardize Indiana's compliance with CMS rules that are necessary for participation in the Medicaid program.

139.    The Final Rule requires the State to ensure that every recipient of Medicaid funding also complies with the Final Rule. "Recipients retain responsibility for ensuring that entities to which they provide significant assistance comply with section 504." 89 Fed. Reg. at 40,109.

140.    The Final Rule imposes requirements that are not achievable for providers and thus increases the likelihood that providers will choose not to participate in Medicaid, which would reduce the level of services available to individuals with disabilities.

141.    Implementation of Medicaid waivers is optional for States.

142.    The Final Rule's requirement that all optional benefits must be provided in "integrated settings" disincentivizes Indiana from offering optional benefits.

143.    Like many areas of the country, Indiana is experiencing significant workforce shortages which affect availability of services.

144.    Compliance with the Final Rule would require Indiana's legislature to subordinate other legitimate state interests to compliance with the Final Rule.

145.    The Final Rule would require the State's healthcare authority to elevate the terms of the Final Rule over the requirements of West Indiana law when making decisions about removal, custody, and the termination of parental rights. *See* 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

146.    Compliance with the Final Rule would require Indiana to expend a vast, yet indeterminate amount of general funds to provide the services required.

147.    All these requirements impose substantial costs and injuries on Indiana. The Final Rule itself acknowledges that States, like Indiana, will incur annualized costs of about $563.6 million per year at a 3% discount rate and $589.8 million at a 7% discount rate. 89 Fed. Reg. at 40,178.

148.    Compliance with the Final Rule would require fundamentally altering the State's systems, programs, and activities as well as its sovereign administration of the State.

149.    Therefore, the Final Rule causes irreparable and severe harm to Indiana and its citizens.

**E.  Impact of the Final Rule on Kansas.**

150.    Kansas participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

151.    Kansas participates in the Medicaid program and must comply with strict rules and regulations set by CMS.

152.    Medicaid accounts for a significant portion of Kansas's state budget.

153.    CMS rules include constraints on the State's ability to change or increase reimbursement rates for providers, such as the "upper payment limit."

154.    The range of services available through Medicaid depends on a variety of factors, many of which are beyond Kansas's control, including the extent to which provider workforce exists, where providers are willing and able to open and sustain a practice, and whether providers opt in to accepting Medicaid reimbursement by enrolling with the state as a Medicaid provider.

155.    Kansas cannot require every Medicaid provider to expand services to the "most integrated setting" described in the Final Rule.

156.    Eradicating wait lists for waiver services would eliminate a primary mechanism for controlling costs.

157.    CMS rules do not allow the aggregate waiver amount to exceed the cost of nursing home or institutional care.

158.    Compliance with the Final Rule would jeopardize Kansas's compliance with CMS rules that are necessary for participation in the Medicaid program.

159.    The Final Rule requires the State to ensure that every recipient of Medicaid funding also complies with the Final Rule. "Recipients retain responsibility for ensuring that entities to which they provide significant assistance comply with section 504." 89 Fed. Reg. at 40,109.

160.    The Final Rule imposes requirements that are not achievable for providers and thus increases the likelihood that providers will choose not to participate in Medicaid, which would reduce the level of services available to individuals with disabilities.

161.    Implementation of Medicaid waivers is optional for States.

162.    The Final Rule's requirement that all optional benefits must be provided in "integrated settings" disincentivizes Kansas from offering optional benefits.

163.    Like many areas of the country, Kansas is experiencing significant workforce shortages which affect availability of services.

164.    Compliance with the Final Rule would require Kansas's legislature to subordinate other legitimate state interests to compliance with the Final Rule.

165.    The Final Rule would require the State's healthcare authority to elevate the terms of the Final Rule over the requirements of Kansas law when making decisions about removal, custody, and the termination of parental rights. *See* 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

166.    Compliance with the Final Rule would require Kansas to expend a vast, yet indeterminate amount of general funds to provide the services required.

167.    All these requirements impose substantial costs and injuries on Kansas. The Final Rule itself acknowledges that States, like Kansas, will incur annualized costs of about $563.6 million per year at a 3% discount rate and $589.8 million at a 7% discount rate. 89 Fed. Reg. at 40,178.

168.    Compliance with the Final Rule would require fundamentally altering the State's systems, programs, and activities as well as its sovereign administration of the State.

169.    Therefore, the Final Rule causes irreparable and severe harm to Kansas and its citizens.

**F.  Impact of the Final Rule on Louisiana.**

170.    Louisiana participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

171.    Louisiana participates in the Medicaid program and must comply with strict rules and regulations set by CMS.

172.    Medicaid accounts for a significant portion of Louisiana's state budget.

173.    CMS rules include constraints on the State's ability to change or increase reimbursement rates for providers, such as the "upper payment limit."

22

174.    The range of services available through Medicaid depends on a variety of factors, many of which are beyond Louisiana's control, including the extent to which provider workforce exists, where providers are willing and able to open and sustain a practice, and whether providers opt in to accepting Medicaid reimbursement by enrolling with the state as a Medicaid provider.

175.    Louisiana cannot require every Medicaid provider to expand services to the "most integrated setting" described in the Final Rule.

176.    Eradicating wait lists for waiver services would eliminate a primary mechanism for controlling costs.

177.    CMS rules do not allow the aggregate waiver amount to exceed the cost of nursing home or institutional care.

178.    Compliance with the Final Rule would jeopardize Louisiana's compliance with CMS rules that are necessary for participation in the Medicaid program.

179.    The Final Rule requires the State to ensure that every recipient of Medicaid funding also complies with the Final Rule. "Recipients retain responsibility for ensuring that entities to which they provide significant assistance comply with section 504." 89 Fed. Reg. at 40,109.

180.    The Final Rule imposes requirements that are not achievable for providers and thus increases the likelihood that providers will choose not to participate in Medicaid, which would reduce the level of services available to individuals with disabilities.

181.    Implementation of Medicaid waivers is optional for States.

182.    The Final Rule's requirement that all optional benefits must be provided in "integrated settings" disincentivizes Louisiana from offering optional benefits.

183.    Like many areas of the country, Louisiana is experiencing significant workforce shortages which affect availability of services.

184.    Compliance with the Final Rule would require Louisiana's legislature to subordinate other legitimate state interests to compliance with the Final Rule.

185.    The Final Rule would require the State's healthcare authority to elevate the terms of the Final Rule over the requirements of Louisiana law when making decisions about removal,

custody, and the termination of parental rights. *See* 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

186.    Compliance with the Final Rule would require Louisiana to expend a vast, yet indeterminate amount of general funds to provide the services required.

187.    All these requirements impose substantial costs and injuries on Louisiana. The Final Rule itself acknowledges that States, like Louisiana, will incur annualized costs of about $563.6 million per year at a 3% discount rate and $589.8 million at a 7% discount rate. 89 Fed. Reg. at 40,178.

188.    Compliance with the Final Rule would require fundamentally altering the State's systems, programs, and activities as well as its sovereign administration of the State.

189.    Therefore, the Final Rule causes irreparable and severe harm to Louisiana and its citizens.

### G.  Impact of the Final Rule on Missouri.

190.    Missouri participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

191.    Missouri participates in the Medicaid program and must comply with strict rules and regulations set by CMS.

192.    Medicaid accounts for a significant portion of Missouri's state budget.

193.    CMS rules include constraints on the State's ability to change or increase reimbursement rates for providers, such as the "upper payment limit."

194.    The range of services available through Medicaid depends on a variety of factors, many of which are beyond Missouri's control, including the extent to which provider workforce exists, where providers are willing and able to open and sustain a practice, and whether providers opt in to accepting Medicaid reimbursement by enrolling with the state as a Medicaid provider.

195.    Missouri cannot require every Medicaid provider to expand services to the "most integrated setting" described in the Final Rule.

196.    Eradicating wait lists for waiver services would eliminate a primary mechanism for controlling costs.

197.    CMS rules do not allow the aggregate waiver amount to exceed the cost of nursing home or institutional care.

198.    Compliance with the Final Rule would jeopardize Missouri's compliance with CMS rules that are necessary for participation in the Medicaid program.

199.    The Final Rule requires the State to ensure that every recipient of Medicaid funding also complies with the Final Rule. "Recipients retain responsibility for ensuring that entities to which they provide significant assistance comply with section 504." 89 Fed. Reg. at 40,109.

200.    The Final Rule imposes requirements that are not achievable for providers and thus increases the likelihood that providers will choose not to participate in Medicaid, which would reduce the level of services available to individuals with disabilities.

201.    Implementation of Medicaid waivers is optional for States.

202.    The Final Rule's requirement that all optional benefits must be provided in "integrated settings" disincentivizes Missouri from offering optional benefits.

203.    Like many areas of the country, Missouri is experiencing significant workforce shortages which affect availability of services.

204.    Compliance with the Final Rule would require Missouri's legislature to subordinate other legitimate state interests to compliance with the Final Rule.

205.    The Final Rule would require the State's healthcare authority to elevate the terms of the Final Rule over the requirements of Missouri law when making decisions about removal, custody, and the termination of parental rights. *See* 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

206.    Compliance with the Final Rule would require Missouri to expend a vast, yet indeterminate amount of general funds to provide the services required.

207.    All these requirements impose substantial costs and injuries on Missouri. The Final Rule itself acknowledges that States, like Missouri, will incur annualized costs of about

$563.6 million per year at a 3% discount rate and $589.8 million at a 7% discount rate. 89 Fed. Reg. at 40,178.

208.    Compliance with the Final Rule would require fundamentally altering the State's systems, programs, and activities as well as its sovereign administration of the State.

209.    Therefore, the Final Rule causes irreparable and severe harm to Missouri and its citizens.

### H. Impact of the Final Rule on Montana.

210.    The Final Rule affects Montana's Department of Health and Human Services (DPHHS). It requires DPHHS to elevate the terms of the Final Rule over the requirements of Montana law when it comes to decisions about removal and termination of parental rights. *See* 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

211.    Montana's Medicaid program expended approximately $2.40 billion in State Fiscal Year 2023. Of that amount, about 79% (or approximately $1.89 billion) represents federal financial participation.

212.    Montana is committed to increasing access to health care for all Montanans. For example, through its Behavioral Health System for Future Generations efforts, a direct outgrowth of the historic passage of H.B. 872 during the 2023 Legislative Session, it is working to invest $300 million to develop and implement targeted solutions to Montana-specific issues in providing services for Montanans with behavioral health and development disabilities. But Montana's unique rural and frontier geography and demographic characteristics make it impossible to provide every service in every community setting.

213.    Montana cannot require every Medicaid provider to expand services to the "most integrated setting" described in the Final Rule.

214.    Montana has implemented a number of Medicaid waivers to increase the availability of community medical and behavioral health services. Several of these waivers have enrollment caps that were approved by CMS.

215.    Eradicating wait lists for waiver services would eliminate a primary mechanism for controlling costs.

216.    CMS rules do not allow the aggregate waiver amount to exceed the cost of nursing home or institutional care.

217.    Compliance with the Final Rule would jeopardize Montana's compliance with CMS rules that are necessary for participation in the Medicaid program.

218.    The Final Rule requires the state to ensure that every recipient of Medicaid funding also complies with the Final Rule. "Recipients retain responsibility for ensuring that entities to which they provide significant assistance comply with section 504." 89 Fed. Reg. at 40,109.

219.    The Final Rule imposes requirements that are not achievable for providers, and thus increases the likelihood that providers will choose not to participate in Medicaid, which would reduce the level of services available to individuals with disabilities.

220.    Implementation of Medicaid waivers is optional for states.

221.    The Final Rule's requirement that all optional benefits must be provided in "integrated settings" may disincentivize Montana from offering optional benefits.

222.    Like many areas of the country, Montana is experiencing significant workforce shortages which affect availability of services. Much of Montana has been designated as health professional shortage areas (HPSAs)

223.    Montana has a population of less than 1.15 million people. It is not fiscally feasible for its system of care to provide all services across the state in the Final Rule's definition of the most integrated setting in every instance.

224.    Compliance with the Final Rule would require Montana's legislature to subordinate other legitimate state interests to Medicaid and other compliance with the Final Rule.

225.    Compliance with the Final Rule would require Montana to expend a vast, yet indeterminate amount of general funds to provide the required Medicaid and other services.

226.    Compliance with the Final Rule would require fundamentally altering the State's systems, programs, and activities as well as its sovereign administration of the State.

227. In sum, the Final Rule imposes severe and irreparable harm on Montana by imposing various costs and attendant risks of administrative proceedings, investigations, lawsuits, and compliance measures.

### I. Impact of the Final Rule on South Dakota.

228. South Dakota participates in Medicaid and must comply with the Final Rule. Compliance with the Final Rule will add new regulatory burdens and impose substantial costs on the State.

229. South Dakota participates in the Medicaid program and must comply with strict rules and regulations set by CMS.

230. Medicaid accounts for a significant portion of South Dakota's state budget.

231. CMS rules include constraints on the State's ability to change or increase reimbursement rates for providers, such as the "upper payment limit."

232. Thirty of South Dakota's sixty-six counties are rural and thirty-four are frontier. South Dakota Medicaid relies on the availability of a provider workforce and settings which are limited and a challenge to sustain in rural settings.

233. The Final Rule requires South Dakota to ensure that *every* recipient of Medicaid funding also complies with the Final Rule. Thus, the Final Rule imposes requirements that would increase the likelihood that providers will choose not to participate in Medicaid, affecting the *level* of services available to all individuals with disabilities.

234. Additionally, this requirement would necessitate more South Dakota Medicaid staff time spent on compliance.

235. As of September 18, 2024, South Dakota Medicaid had 143,290 individuals enrolled, of which approximately 12% were in a person with disabilities aid category.

236. South Dakota Medicaid has several programs available for individuals with disabilities, including the Home & Community-Based Options, Person Centered Excellence, HOPE Waiver (in two settings) and Medical Assistance for Workers with Disabilities (MAWD).

Increasing the population of potentially eligible individuals, by a number presently unknowable, would result in new unbudgeted costs in the programs.

237.    The range of services available through Medicaid depends on a variety of factors, many of which are beyond South Dakota's control, including the extent to which provider workforce exists, where providers are willing and able to open and sustain a practice, and whether providers opt in to accepting Medicaid reimbursement by enrolling with the state as a Medicaid provider.

238.    South Dakota cannot require every Medicaid provider to expand services to the "most integrated setting" described in the Final Rule.

239.    Eradicating wait lists for waiver services would eliminate a primary mechanism for controlling costs.

240.    CMS rules do not allow the aggregate waiver amount to exceed the cost of nursing home or institutional care.

241.    Compliance with the Final Rule would jeopardize South Dakota's compliance with CMS rules that are necessary for participation in the Medicaid program.

242.    The Final Rule requires the State to ensure that every recipient of Medicaid funding also complies with the Final Rule. "Recipients retain responsibility for ensuring that entities to which they provide significant assistance comply with section 504." 89 Fed. Reg. at 40,109.

243.    The Final Rule imposes requirements that are not achievable for providers and thus increases the likelihood that providers will choose not to participate in Medicaid, which would reduce the level of services available to individuals with disabilities.

244.    Implementation of Medicaid waivers is optional for States.

245.    The Final Rule's requirement that all optional benefits must be provided in "integrated settings" disincentivizes South Dakota from offering optional benefits.

246.    Like many areas of the country, South Dakota is experiencing significant workforce shortages which affect availability of services.

247.    Compliance with the Final Rule would require South Dakota's legislature to subordinate other legitimate state interests to compliance with the Final Rule.

248.    The Final Rule would require the State's healthcare authority to elevate the terms of the Final Rule over the requirements of South Dakota law when making decisions about removal, custody, and the termination of parental rights. *See* 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60(a)(2)(i)–(ii)).

249.    Compliance with the Final Rule would require South Dakota to expend a vast, yet indeterminate amount of general funds to provide the services required.

250.    All these requirements impose substantial costs and injuries on South Dakota. The Final Rule itself acknowledges that States, like South Dakota, will incur annualized costs of about $563.6 million per year at a 3% discount rate and $589.8 million at a 7% discount rate. 89 Fed. Reg. at 40,178.

251.    Compliance with the Final Rule would require fundamentally altering the State's systems, programs, and activities as well as its sovereign administration of the State.

252.    Therefore, the Final Rule causes irreparable and severe harm to South Dakota and its citizens.

## CLAIMS FOR RELIEF

### COUNT 1
### The Final Rule Exceeds Statutory Authority and
### Is Not in Accordance with Law
### 5 U.S.C. § 706

253.    All other allegations are repeated and realleged as if fully set forth herein.

254.    The Final Rule is final agency action and reviewable under the APA.

255.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

256. The Final Rule exceeds Defendants' statutory authority by obligating recipients of federal financial assistance to alter their programs and activities to ensure the provision of services in "the most integrated setting" as defined in the Final Rule.

257. The Final Rule also exceeds Defendants' statutory authority by imposing prohibitions on actions resulting in "serious risk of institutionalization" and allowing claims of discrimination to be asserted even when no institutionalization or segregation has occurred.

258. The Final Rule also exceeds HHS's statutory authority by directing state budgets to serve the policy priorities of a federal administrative agency.

**COUNT 2**
**The Final Rule is Arbitrary and Capricious**
**5 U.S.C. § 706**

259. All other allegations are repeated and realleged as if fully set forth herein.

260. The APA requires courts to set aside agency action that is "arbitrary, capricious," or an "abuse of discretion." 5 U.S.C. § 706(2)(A).

261. "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

262. "[A]gency action" is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent thereof, or failure to act." 5 U.S.C. § 551(13). An agency "rule" is defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." *Id.* at § 551(4).

263. An agency action is arbitrary or capricious if it fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice

made." *State Farm*, 463 U.S. at 43. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary and capricious." 5 U.S.C. § 706(2)(A).[4]

264.    The Final Rule is arbitrary and capricious in imposing its "integration mandate" and in imposing an "at risk" theory of discrimination.

265.    *First*, HHS has created conflicting obligations and permission structures between different federal agencies. For instance, a State that takes steps to comply with CMS's cost neutrality requirements may be deemed "discriminatory" by the HHS's Office for Civil Rights.

266.    *Second*, HHS prevents States from innovating and improving their service delivery systems. The Final Rule requires even optional services to be provided across the board in every setting.

267.    *Third*, HHS has failed to consider or arbitrarily rejected alternative solutions to the system concerns it identified.

268.    *Fourth*, HHS has created a regime that is impossible for any State to fully comply with.

269.    *Fifth*, HHS arbitrarily rejected federal law and binding caselaw that contradicted its policy preferences.

270.    Plaintiffs submitted objections to the proposed rule with reasonable specificity and HHS failed to address or respond to these objections. HHS's response "did not address the applicants' concern so much as sidestep it." *Ohio v. EPA*, 144 S. Ct. 2040, 2046 (2024).

### COUNT 3
### The Final Rule is Unconstitutional
### 5 U.S.C. § 706

271.    All other allegations are repeated and realleged as if fully set forth herein.

272.    A federal agency has no power to act on its own, without authority delegated by Congress. *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986).

---

[4] "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained,'" and an agency must provide "'a satisfactory explanation for its action.'" *Ohio v. EPA*, 144 S. Ct. 2040, 2045 (2024) (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150)).

273.    Congress must unambiguously specify the conditions it attaches to federal grants to States so that States can "clearly understand" from statutory language the terms on which they accept federal funding. *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

274.    The APA requires courts to set aside and vacate agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B); *see also id.* § 706(2)(A).

275.    Conditions on federal spending are unconstitutional when they "cross[] the line distinguishing encouragement from coercion." *New York*, 505 U.S. at 175. Moreover, Congress exceeds its spending clause powers by "surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25.

276.    The Final Rule unfairly surprises state recipients by redefining Section 504 to include the newly formulated "integration mandate" and "at risk" theory of discrimination. Since Section 504 is a condition on federal grants, the Final Rule therefore subjects States to significant new conditions on federal spending.

277.    Section 504 applies to all federal funds, so the Final Rule forces States to choose between a ruinous withdrawal of federal funding and compliance with the new protections. This is an impossible choice, and the Final Rule is unconstitutionally coercive for forcing it on the States.

278.    Because the Final Rule's new requirements cannot be gleaned from the plain language of the Rehabilitation Act, the Rule unfairly surprises States with conditions they could not have "voluntarily and knowingly" agreed to. HHS may not regard the Act as the source of hidden conditions that the States unwittingly signed off on when they accepted federal money.

279.    Accordingly, the Final Rule violates the Spending Clause and is therefore contrary to constitutional right.

## DECLARATORY JUDGMENT

280.    The federal Declaratory Judgment Act authorizes federal courts to declare the rights of litigants. 28 U.S.C. § 2201. The issuance of a declaratory judgment can serve as the basis for an injunction to give effect to the declaratory judgment. *Steffel v. Thompson*, 415 U.S. 452, 461 n.11 (1974).

281.    For the reasons described above, Plaintiffs are entitled to a declaration that the Final Rule exceeds statutory authority and is therefore unlawful and void and that Section 504 violates the Spending Clause.

### DEMAND FOR RELIEF

Plaintiffs respectfully request that the Court:

a.    Declare that the Final Rule violates the Administrative Procedure Act because it is unconstitutional, exceeds statutory authority and is contrary to law, and arbitrary and capricious;

b.    Hold unlawful and set aside (*i.e.*, vacate) the Final Rule;

c.    Issue permanent injunctive relief against Defendants enjoining them from enforcing the Final Rule;

d.    Issue permanent injunctive relief against Defendants enjoining them from obligating Plaintiffs to alter their programs and activities to ensure the provision of services in "the most integrated setting" as defined in the Final Rule, and enjoining them from prohibiting Plaintiffs to engage in actions resulting in "serious risk of institutionalization" and from allowing claims of discrimination to be asserted even when no institutionalization or segregation has occurred;

e.    Award attorneys' fees and costs incurred in this action to Plaintiffs;

f.    Issue any and all other relief to Plaintiffs the Court deems just and proper.

Dated: January 23, 2026.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division

**ZACHARY L. RHINES**
Special Counsel
Special Litigation Division
Texas State Bar No. 24116957
zachary.rhines@oag.texas.gov

*/s/ Kyle S. Tebo*
**KYLE S. TEBO**
Special Counsel
Legal Strategy Division
Texas State Bar No. 24137691
kyle.tebo@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF
TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone:    (512) 463-2100
Facsimile:    (512) 457-4410

**COUNSEL FOR STATE OF TEXAS**

Respectfully submitted,

STEPHEN J. COX
Attorney General of Alaska

*/s/ Laura O. Russell*
**LAURA O. RUSSELL\***
Alaska Bar No. 1311106

Assistant Attorney General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
Telephone: (907) 269-5100
laura.russell@alaska.gov

**COUNSEL FOR STATE OF ALASKA**
*\*Pro Hac Vice*

JAMES UTHMEIER
Attorney General of Florida

*s/ Christine Kimberly Pratt*
**CHRISTINE KIMBERLY PRATT**
Office of the Florida Attorney General
400 S. Monroe Street
Tallahassee, Florida 32399
(352) 359-6689
christine.pratt@myfloridalegal.com

**COUNSEL FOR STATE OF FLORIDA**

THEODORE E. ROKITA
Attorney General of Indiana

*/s/ James A. Barta*
**JAMES A. BARTA\***
Solicitor General
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, Indiana 46204
(317) 232-0709
james.barta@atg.in.gov

**COUNSEL FOR STATE OF INDIANA**
*\*Pro Hac Vice*

35

KRIS W. KOBACH
Attorney General of Kansas

*/s/ James Rodriguez*
JAMES RODRIGUEZ
Assistant Attorney General
120 SW 10th Ave
Topeka, Kansas 66612-1597
Telephone: (785) 260-3960
jay.rodriguez@ag.ks.gov

COUNSEL FOR STATE OF KANSAS

ELIZABETH B. MURRILL
Attorney General of Louisiana

*s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA*
Solicitor General
Office of the Attorney General
1885 N. 3rd St.
Baton Rouge, Louisiana 70802
Telephone:    (225) 506-3746
aguinagab@ag.louisiana.gov

COUNSEL FOR STATE OF LOUISIANA
*Pro Hac Vice*

CATHERINE L. HANAWAY
Attorney General of Missouri

*/s/ Louis Joseph Capozzi, III*
LOUIS JOSEPH CAPOZZI, III
Office of the Missouri Attorney General
207 W. High Street
Jefferson City, Missouri 65101
Louis.capozzi@ago.mo.gov

COUNSEL FOR STATE OF MISSOURI

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
Solicitor General
PETER M. TORSTENSEN, JR.*
Deputy Solicitor General
Montana Department of Justice
215 N. Sanders Street
Helena, Montana 59601
Telephone: (406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

COUNSEL FOR STATE OF MONTANA
*Pro Hac Vice*

MARTY JACKLEY
Attorney General of South Dakota

*/s/ Grant Michael Flynn*
GRANT MICHAEL FLYNN*
Assistant Attorney General

Office of the Attorney General South Dakota
1302 S.D. Highway 1889, Suite #1
Pierre, South Dakota 57501
Telephone:  (605) 773-3215
grant.flynn@state.sd.us

COUNSEL FOR STATE OF SOUTH DAKOTA
*Pro Hac Vice*

### CERTIFICATE OF CONFERENCE

I hereby certify that on January 14, 2026, counsel conferred with opposing counsel, via email to seek their consent for Plaintiffs to amend their complaint. On January 22, 2026, Defendants through counsel replied in writing that they consent to Plaintiffs filing this First Amended Complaint.

*/s/ Kyle S. Tebo*
KYLE S. TEBO


### CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on January 23, 2026, and that all counsel of record were served by CM/ECF.

*/s/ Kyle S. Tebo*
KYLE S. TEBO