**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

STATE OF TEXAS,
STATE OF ALASKA,
STATE OF FLORIDA,
STATE OF KANSAS,
STATE OF LOUISIANA,
STATE OF MISSOURI, and
STATE OF MONTANA,

        *Plaintiffs*,

v.

ROBERT F. KENNEDY JR., in his official capacity
as Secretary of Health and Human Services,
and UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

        *Defendants.*

CASE NO. 5:24-CV-00225-H

---

**PLAINTIFF STATES' BRIEF IN SUPPORT OF**
**OPPOSED MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

Table of Authorities .................................................................................................... iii

Introduction ...................................................................................................................1

Background ....................................................................................................................1

    I.   Statutory and regulatory background....................................................................1

        A.  Disability law.............................................................................................1

            1.   The Rehabilitation Act................................................................ 2

            2.   The Americans with Disabilities Act ......................................... 2

            3.   The *Olmstead* case.............................................................................3

        B.  Medicaid law .............................................................................................5

    II.  The Rule .............................................................................................................7

Legal Standard ........................................................................................................... 9

Argument .................................................................................................................... 11

    I.   The Rule is unlawful and in excess of statutory authority. ................................. 11

        A.  Section 504 does not provide for an "at risk" theory of discrimination...................... 11

        B.  The Fifth Circuit has foreclosed the at-risk theory of discrimination. ........................13

        C.  Section 504 does not require federally-assisted programs to be delivered in the "most integrated setting."...................................................................14

        D.  Alternatively, the Rule's "most integrated setting" mandate exceeds Defendants' statutory authority by imposing a standard of care. ...............................17

        E.  The Rule violates the Major Questions Doctrine .......................................................19

    II.  The Rule is arbitrary and capricious. ...............................................................21

        A.  HHS failed to address the Rule's conflict with CMS Regulations. ........................... 22

        B.  HHS unreasonably dismissed binding Fifth Circuit precedent and risks creating non-uniform regulation. ...................................................................23

        C.  HHS failed to consider the significant fiscal and administrative burdens the Rule imposes on States. .........................................................................25

    III. The Final Rule is unconstitutionally coercive and commandeers state government........ 26

    IV. Plaintiff States have standing. ........................................................................ 30

    V.  The entire Rule is unlawful and should be vacated in its entirety......................................32

Conclusion ..................................................................................................................32

Certificate of Service..................................................................................................34

TABLE OF AUTHORITIES

**Cases**

*AbbVie, Inc. v. Fitch*,
152 F.4th 635 (5th Cir. 2025) ................................................................................21

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*
594 U.S. 758 (2021) .......................................................................................20, 21

*Alexander v. Choate*,
469 U.S. 287 (1985) .................................................................................... 10, 17

*Am. Tobacco v. Patterson*,
456 U.S. 63 (1982) .............................................................................................12

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...........................................................................................10

*Arlington Cent. Sch. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006) ..................................................................................... 28, 29

*Biden v. Nebraska*,
600 U.S. 477 (2023) ......................................................................................... 20

*Buchanan v. Maine*,
469 F.3d 158 (1st Cir. 2006) ..............................................................................18

*Carlson v. Postal Regul. Comm'n*,
938 F.3d 337 (D.C. Cir. 2019) .......................................................................... 22

*Castro v. Cnty. of Los Angeles*,
833 F.3d 1060 (9th Cir. 2016) ...........................................................................17

*Charles C. Steward Machine Co. v. Davis*,
301 U.S. 548 (1937) ...........................................................................................27

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .....................................................................................30, 32

*Contender Farms, L.L.P. v. U.S.*,
779 F.3d 258 (5th Cir. 2015) ........................................................................... 30

*Corner Post, Inc. v. Bd. of Govs. of Fed. Reserve Sys.*,
603 U.S. 799 (2024) ...........................................................................................32

*Data Mktg. PShip, L.P. v U.S. Dep't of Lab.*,
45 F.4th 846 (5th Cir. 2022) ..............................................................................32

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ...........................................................................................21

*Flynn v. Distinctive Home Care, Inc.*,
812 F.3d 422 (5th Cir. 2016) ........................................................................11, 12

*Frame v. City of Arlington*,
 657 F.3d 215 (5th Cir. 2011) ............................................................... 12, 14

*Gonzales v. Oregon*,
 546 U.S. 243 (2006) ................................................................................12

*Gregory v. Ashcroft*,
 501 U.S. 452 (1991) ............................................................................. 26

*Harris v. McRae*,
 448 U.S. 297 (1980) .................................................................................5

*Huawei Techs. USA, Inc. v. FCC*,
 2 F.4th 421 (5th Cir. 2021)...................................................................... 22

*K Mart Corp. v. Cartier, Inc.*,
 486 U.S. 281 (1988)................................................................................32

*La. Pub. Serv. Comm'n v. FCC*,
 476 U.S. 355 (1986)................................................................................16

*Loper Bright Enters. v. Raimondo*,
 603 U.S. 369 (2024) ..........................................................................10, 20

*Motor Vehicle Mfrs.* ,
 463 U.S. 29 (1983)..................................................................................25

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*,
 595 U.S. 109 (2022) ...............................................................................10

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
 567 U.S. 519 (2012) .......................................................................... passim

*Nat'l Org. for Women, Inc. v. Scheidler*,
 510 U.S. 249 (1994)................................................................................16

*New York v. United States*,
 505 U.S. 144 (1992).............................................................................. 28

*Northcross v. Board of Educ.*,
 412 U.S. 427 (1973) ...............................................................................13

*Ohio v. EPA*,
 603 U.S. 279 (2024) ...........................................................................23, 24

*Olmstead v. L. C. by Zimring*,
 527 U.S. 581 (1999) .......................................................................... passim

*Pennhurst State Sch. & Hosp. v. Halderman*,
 451 U.S. 1 (1981) ..................................................................... 15, 27, 28, 29

*Printz v. United States*,
 521 U.S. 898 (1997) ................................................................................27

*Rodriguez v. City of New York*,
  197 F.3d 611 (2d Cir. 1999)........................................................................17

*Ross v. Blake*,
  578 U.S. 632 (2016).....................................................................................11

*Russello v. United States*,
  464 U.S. 16 (1983).......................................................................................16

*S. Dakota v. Dole*,
  483 U.S. 203 (1987)................................................................................27, 28

*Simmons v. Navajo County*,
  609 F.3d 1011 (9th Cir. 2010)......................................................................17

*Smith v. City of Jackson*,
  544 U.S. 228 (2005).....................................................................................13

*Sweetin v. City of Texas*,
  48 F.4th 387 (5th Cir. 2022) ........................................................................10

*Texas v. EEOC*,
  933 F.3d 433 (5th Cir. 2019)........................................................................ 30

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022)........................................................................21

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ....................................................................... 30

*Townsend v. Quasim*,
  328 F.3d 511 (9th Cir. 2003) .......................................................................17

*United States v. Mississippi*,
  82 F.4th 387 (5th Cir. 2023) ....................................................... 11, 13, 14, 24

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ........................................................................ 11, 20, 21

**Statutes**

5 U.S.C. § 706(2) ..........................................................................................10, 30

25 U.S.C. § 5302 ................................................................................................31

29 U.S.C. § 701 ........................................................................................11, 15, 28

29 U.S.C. § 705 ..................................................................................................11

29 U.S.C. § 720 ..................................................................................................11

29 U.S.C. § 721 ..................................................................................................11

29 U.S.C. § 794 ........................................................................................... passim

29 U.S.C. § 796 ..................................................................................................11

42 U.S.C. § 12101................................................................................................2, 16

42 U.S.C. § 12111 ........................................................................................................... 9

42 U.S.C. § 12112 ........................................................................................................... 9

42 U.S.C. § 12113 ........................................................................................................... 9

42 U.S.C. § 12114 ........................................................................................................... 9

42 U.S.C. § 12115 ........................................................................................................... 9

42 U.S.C. § 12116 ........................................................................................................... 9

42 U.S.C. § 12117 ........................................................................................................... 9

42 U.S.C. § 12131 .......................................................................................................2, 3

42 U.S.C. § 12132 ......................................................................................................2, 13

42 U.S.C. § 12134 ......................................................................................................3, 12

42 U.S.C. § 12182 ........................................................................................................... 2

42 U.S.C. § 12201 ........................................................................................................... 2

42 U.S.C. § 1396-1 ..........................................................................................................5

42 U.S.C. § 1396a..........................................................................................................5, 22

42 U.S.C. § 1396b ...........................................................................................................5

42 U.S.C. § 1396c ...........................................................................................................5

42 U.S.C. § 1396d ..................................................................................................... 6, 20

42 U.S.C. § 1396n ........................................................................................................6, 7

42 U.S.C. § 2000e-4 ....................................................................................................... 9

42 U.S.C. § 2000e-6 ....................................................................................................... 9

42 U.S.C. 42 U.S.C. § 1396d ........................................................................................32

ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553............................13

Alaska Stat. 47.07.020...................................................................................................31

Alaska Statute 47.07.030................................................................................................31

Omnibus Budget Reconciliation Act of 1981., 95 Stat. 357 (1981)Pub. L. 97–95 Stat. 357
    (1981)95 Stat. 357 (1981) ........................................................................................7

**Other Authorities**

Br. of the United States as Plaintiff-Appellee, No. 21-60772, 2022 WL 1017186, at *25
    (Mar. 29, 2022 5th Cir.)............................................................................................ 24

Comment from Alaska Department of Law, HHS-OCR-2023-0013, HHS-OCR-2023-
    0013-0001, 2023-19149 (Nov. 19, 2023), available at
    https://www.regulations.gov/comment/HHS-OCR-2023-0013-0763................................. 24

Compl., *United States v. Mississippi*,
No. 3:16-cv-622, 2016 WL 4260801, at *1 (S.D.Miss. Aug. 11, 2016) .................................... 24

*Discrimination on the Basis of Disability in Health and Human Service Programs or Activities*,
88 Fed. Reg. 63,392 (Sep. 14, 2023).................................................................. passim

*Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for
Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or
Disabled Persons for October 1, 2026, Through September 30, 2027*, 90 Fed. Reg. 54696-
01 (Nov. 28, 2025) ................................................................................................ 20

I*ndian Entities Recognized by and Eligible To Receive Services From the United States Bureau
of Indian Affairs*, 88 Fed. Reg. 2,112 (Jan. 12, 2023) ....................................................31

*Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal
Financial Assistance*, 89 Fed. Reg. 40,066 (May 9, 2024) ................................................ passim

*Nondiscrimination on the Basis of Disability, Accessibility of Medical Diagnostic Equipment of
State and Local Government Entities*, 89 Fed. Reg. 65,180 (Aug. 9, 2024)..............................23

*Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of
State and Local Government Entities*, 89 Fed. Reg. 31,320 (Apr. 24, 2024) ..............................23

U.S. Dep't of Health & Hum. Servs., Office for Civil Rights, Section 504 of the
Rehabilitation Act of 1973 Notice of Proposed Rulemaking: Regulatory Impact
Analysis (RIA), at 6 (2023), https://www.hhs.gov/sites/default/files/sec-504-rehab-
act-npr-ria.pdf. .............................................................................................25, 26

U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs,
Instructions, Technical Guide and Review Criteria (2024), available at
https://wms-mmdl.cms.gov/WMS/help/version_3.7_1915c_Waiver_Application_a
nd_Accompanying_Materials.zip .......................................................................... 6

**Rules**

Fed. R. Civ. P. 56(a)....................................................................................... 9

**Regulations**

28 C.F.R. § 35.130...............................................................................3, 12, 18, 19

28 C.F.R. § 35.149.......................................................................................12

28 C.F.R. § 35.150.......................................................................................12

29 CFR § 32 ............................................................................................. 2

42 C.F.R. § 430.25 ..................................................................................... 6

42 CFR § 440............................................................................................5

45 C.F.R. § 84 ................................................................................. 9, 18, 19

45 C.F.R. § 84.10 ......................................................................................15

45 C.F.R. § 84.16 ...................................................................................... 9

45 C.F.R. § 84.4 ........................................................................................................16

45 C.F.R. § 84.76 .............................................................................................15, 18, 19

**Constitutional Provisions**

U.S. CONST. art. I, § 8, cl. 1 ...................................................................................27

### INTRODUCTION

The Department of Health and Human Services (HHS) issued a Final Rule[1] that reinterprets federal disability law to impose expansive new requirements and liabilities on all recipients of federal funding.

The rule stands disability law on its head. Instead of prohibiting entities from excluding individuals with disabilities from programs and services, the rule adds affirmative obligations for entities to create entire new systems of care. These new obligations are not supported by any new source of funding, conflict with other federal requirements, and invent a private cause of action for any individual who feels they could "eventually" be placed in an institutional setting even if they have never been subjected to exclusion or institutionalization by the state.

The Final Rule is unlawful. HHS arbitrarily and capriciously implemented a Final Rule which imposes massive costs, coerces state government, and creates an unfunded universal health care requirement without authority and without consideration of the information submitted during public comment. None of these new requirements align with the legal principles established by Congress and the United States Supreme Court. With no statutory basis, this Rule subjects recipients to limitless liability and jeopardizes the continued viability of state Medicaid programs.

Accordingly, Plaintiffs move the Court to find in their favor and grant summary judgment.[2]

### BACKGROUND

**I. Statutory and regulatory background**

**A. Disability law**

Congress has established through two major pieces of legislation, the Rehabilitation Act of 1973 and the Americans with Disabilities Act, a simple principle: when a state offers a service or program, it cannot discriminate based on disability. These two Acts complement each other to

---

[1] *Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 40,066, 40,068–69 (May 9, 2024) ("Final Rule").

[2] State Plaintiffs request relief against the Final Rule and in this Motion do not contest the constitutionality of 29 U.S.C. § 794.

ensure that qualified individuals with disabilities are not denied access to the same programs and services that are provided to the general population.

### 1. The Rehabilitation Act

Section 504 of the Rehabilitation Act of 1973 (Section 504) was enacted by Congress to make it illegal for programs or activities that receive federal funding to discriminate in the provision of those services solely for the reason of a person's disability. 29 U.S.C. § 794(a). By accepting federal funds, an entity is subject to Section 504's nondiscrimination mandate. *See* 29 U.S.C. § 794(a) (prohibiting recipients of federal funds from discriminating based on disability status.). The statute defines "program or activity" broadly, to include all operations performed by state and local governments. *Id.* § 794(b)(1)–(4). Moreover, a "[q]ualified individual with a disability" is defined in regulation as, "with respect to services, a handicapped individual who meets eligibility requirements relevant to the receipt of services provided in the program or activity." 29 CFR § 32.3.

### 2. The Americans with Disabilities Act

In 1990, Congress expanded disability protections through the passage of the Americans with Disabilities Act (ADA). Finding discrimination in the form of exclusion, isolation, segregation, and discriminatory institutionalization "a serious and pervasive social problem," 42 U.S.C. § 12101(a)(2), Congress modeled the ADA on Section 504 but broadened its applicability beyond recipients of federal funding to include "public entities," *id.* § 12131, as well as private entities operating public accommodations, *id.* § 12182(a).

The ADA itself confirms that it operates in tandem with Section 504. By statute, "nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 . . . or the regulations issued by Federal agencies pursuant to such title." *Id.* § 12201(a). And Title II's operative provision tracks Section 504 closely: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132. A "qualified individual with a disability" is one

2

who, "with or without reasonable modifications," "meets the essential eligibility requirements" for a public entity's services or programs. *Id.* § 12131(2).

In accordance with the ADA, Congress directed the Attorney General to promulgate Title II implementing regulations. *Id.* § 12134(a). Among those regulations is what has come to be called the "integration mandate": public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The Department's preamble to the regulation explains that the most integrated setting is one "that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." *Id.* pt. 35, app. B. By its own terms, the prohibition on discrimination applies to "all services, programs, and activities provided or made available by State and local governments" and to "public entities that receive Federal financial assistance." *Id.*

### 3.  The *Olmstead* case

The next piece to this complex framework is the Supreme Court's decision *Olmstead v. L. C. by Zimring*, 527 U.S. 581 (1999). In *Olmstead*, the Supreme Court interpreted the ADA and its implementing regulations to bar "unjustified institutional isolation of persons with disabilities" as "a form of discrimination." *Id.* at 600. In that case, two women with mental disabilities had been voluntarily admitted to a Georgia psychiatric institution. After their treatment concluded, the State's own treatment professionals determined that community placement was appropriate, and existing state programs already "provided community-based treatment of the kind for which [plaintiffs] qualified," at "considerably *less* cost than is required to maintain them in an institution." *Id.* at 594–95. The State nevertheless kept them confined. The plaintiffs sued under Title II and the Attorney General's "integration regulation," 28 C.F.R. § 35.130(d), which requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." The Supreme Court ultimately held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Olmstead*, 527 U.S. at 597.

3

But the Court's holding was tightly cabined. Community placement is required, the Court explained, only when three conditions converge: (1) the State's own "treatment professionals have determined that community placement is appropriate"; (2) "the affected persons do not oppose such placement"; and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* at 587. The Court was emphatic that its decision did not transform the ADA into a standard-of-care statute. It explicitly rejected the idea that the ADA implemented a "'standard of care' for whatever medical services they render, or that the ADA requires States to "provide a certain level of benefits to individuals with disabilities.'" *Id.* at 603 n.14 (majority) (internal citation omitted) (emphasis added) (quoting *id.* at 624 (Thomas, J., dissenting)). Much the opposite, the Court held that "States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *Id.*

The Court also made several caveats to its holding. The ADA was not "reasonably read to impel States to phase out institutions, placing patients in need of close care at risk." *Id.* at 605. Reasonable waitlists for community placement were permissible, so long as they were not designed "to keep [the State's] institutions fully populated." *Id.* at 605–06. And in the concurrence that supplied the decisive fifth vote, Justice Kennedy explained that "it is a quite different matter to say that a State without a program in place is required to create one." *Id.* at 612 (Kennedy, J., concurring in judgment). "No State has unlimited resources, and each must make hard decisions on how much to allocate to treatment of diseases and disabilities." *Id.* Those choices, he emphasized, are "political" and "not within the reach of the statute." *Id.* at 612–13.

All this to say *Olmstead* did not analyze the validity of the ADA regulations requiring the "most integrated setting," because the Court "d[id] not understand petitioners to challenge the regulatory formulations themselves as outside the congressional authorization." *Id.* at 592. By explicitly providing "the caveat that we do not here determine their validity," the *Olmstead* court was careful to preempt any inference of approval of the underlying "integrated setting" and "reasonable modifications" regulations.

4

### B. Medicaid law

The Medicaid program also plays a crucial role in this analysis. Medicaid is a health insurance program for needy individuals which is administered by states according to federal requirements and is funded jointly by States and the federal government. See 42 U.S.C. § 1396-1 (Appropriations), 42 U.S.C. § 1396b (Payment to States). It is federally administered by the Centers for Medicare & Medicaid Services (CMS), an agency within HHS, and is a "cooperative endeavor" in which states that choose to participate in the optional Medicaid program receive financial contribution from the federal government. *Harris v. McRae*, 448 U.S. 297, 308 (1980).

The Supreme Court has previously held that the Medicaid Act does not require a participating state to fund the cost of a medically necessary service for which federal reimbursement is unavailable. *Id.* at 301. Medicaid "was designed as a cooperative program of shared financial responsibility, not as a device for the Federal Government to compel a State to provide services that Congress itself is unwilling to fund." *Id.* at 309.

Although participation in Medicaid is optional, states that choose to participate and receive federal funds must comply with the requirements of the Medicaid Act. *Id.* at 301; *see* 42 U.S.C. § 1396a. These rules are complex and prescriptive.

States submit "State plans" for approval by the Secretary of Health and Human Services (the Secretary). 42 U.S.C. § 1396-1 ("The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary, State plans for medical assistance."); 42 U.S.C. § 1396a (prescribing content of State plans for medical assistance); 42 U.S.C. § 1396b (enumerating circumstances and amounts of federal payments to states with approved plans). The plan must satisfy the eighty-nine conditions set forth in 42 U.S.C. § 1396a. The state plan must be effective statewide, 42 U.S.C. § 1396a(a)(1). the services comparable between all recipients, 42 U.S.C. § 1396a(10)(B); 42 CFR § 440.240. and must impose income and resource requirements. 42 U.S.C. § 1396a(10)(C)(i)(III). If the Secretary finds that a state's administration of its plan does not meet statutory conditions, the federal government can withhold some or all its funding. 42 U.S.C. § 1396c. If a State does not comply with the Act's new

coverage requirements, it may lose not only the federal funding for those requirements, but all of its federal Medicaid funds. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012).

The federal Medicaid program has long favored institutional and medical-model care. Federal law limits states to covering only the services that are explicitly permitted. 42 U.S.C. § 1396d(a) (explaining that "medical assistance" includes the services listed therein). Within this framework, states *must* cover specific mandatory benefits. States *may*—or may not—choose to cover specified optional benefits. Mandatory benefits include hospital services and nursing facility services. See 42 U.S.C. § 1396d(a). Optional benefits include home and community-based services, which can only be provided by the state if the Secretary issues a "waiver." 42 U.S.C. § 1396n.

Under specific circumstances, states can provide services outside of the normal Medicaid parameters through a federally authorized waiver. The Medicaid waiver program statutorily authorizes the Secretary to waive certain Medicaid requirements, including statewideness and comparability, "to the extent he finds it to be cost-effective and efficient." 42 U.S.C. § 1396n(c)(1). "Waivers allow exceptions to State plan requirements and permit a State to implement innovative programs or activities on a time-limited basis, and subject to specific safeguards for the protection of beneficiaries and the program." 42 C.F.R. § 430.25.

In practical terms what this means is that before a state can even provide many home—or community-based—services through its Medicaid program, it must go through lengthy, expensive, and cumbersome processes to obtain approval from the Secretary. See 42 U.S.C. § 1396n; *see also* U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs, Instructions, Technical Guide and Review Criteria (2024), available at https://wms-mmdl.cms.gov/WMS/hel p/version_3.7_1915c_Waiver_Application_and_Accompanying_Materials.zip. These "waivers " will not be approved (or renewed) unless the state demonstrates that, among other things, (1) a person who would receive home—or community-based services meets criteria to receive Medicaid *institutional* care, and (2) the waiver is cost-neutral—in other words, the average per capita expenditure for HCBS may not exceed the average per capita expenditure for non-HCBS (i.e.,

6

institutional) services. 42 U.S.C. § 1396n(c)(2)(D). Federal statute also explicitly permits States to cap the number of individuals receiving HCBS waiver services, in order for a State to maintain cost neutrality. *Id.* § 1396n(c)(4)(A).

It is also important to understand that the HCBS waivers are designed to serve *individual* recipients. See 42 U.S.C. § 1396n(c)(1) (requiring a determination and written plan of care on an individual basis, finding that the specific individual would require an institutional level of care "but for the provision of such services."). Federal approval for an HCBS waiver does not mean that the state can provide the HCBS services to all Medicaid recipients. Instead, each recipient must separately and specifically qualify to receive waiver services, even if they are generally Medicaid-eligible for other standard services.

Medicaid was created in 1965, but it was not until 1981 that Congress created the home and community-based services (HCBS) waiver program with Section 2176 of the Omnibus Budget Reconciliation Act of 1981. Pub. L. 97-35, 95 Stat. 357 (1981). And forty-five years later, Congress still has not chosen to integrate HCBS waiver services into the standard Medicaid program. To this day, Medicaid requires coverage of institutional care but not most home and community-based services. And states can only include HCBS in their programs if the federal government literally "waives" its bias for institutional care.

## II. The Rule

The Defendants issued a Final Rule on May 9, 2024 that significantly altered its regulations implementing Section 504. *See* 89 Fed. Reg. 40,066, 40,068–69 (May 9, 2024) ("Final Rule"). The Final Rule's reach is vast. By its own terms, it applies to every "recipient" of "Federal financial assistance" from HHS, 89 Fed. Reg. at 40,180. The Rule itself defines these terms broadly.

A "recipient" includes "any State or its political subdivision, any instrumentality of a State or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient." 89 Fed. Reg. at 40,184. "Federal financial assistance," in turn, encompasses not only

7

"[f]unds," but "[s]ervices of Federal personnel," "[r]eal and personal property or any interest in or use of such property," and "[a]ny other thing of value by way of grant, loan, contract, or cooperative agreement." *Id.* at 40,183. Through these definitions the Rule reaches the full machinery of state healthcare and human-services delivery, including Medicaid programs, child welfare systems, behavioral-health systems, and the broader network of state agencies and contracted providers through which those programs operate. States, as recipients, are also made responsible for ensuring that the entities to which they distribute federal funds themselves comply. *Id.* at 40,109 (stating that "[r]ecipients retain responsibility for ensuring that entities to which they provide significant assistance comply with Section 504.").

The Final Rule dramatically revises existing disability law far beyond the scope of the statutes. The foundational elements to this new regulatory construct involve the Rule's so-called "integration mandate" and its "at risk" theory of liability.

The Rule's "most integrated setting mandate" requires every recipient to "administer a program or activity in the most integrated setting appropriate to the needs of a qualified person with a disability." 89 Fed. Reg. at 40,192. The Rule then defines "most integrated setting" as "a setting that provides individuals with disabilities the opportunity to interact with nondisabled persons to the fullest extent possible." *Id.* at 40,183. The Rule treats anything short of that ideal as "segregated" and therefore discriminatory. The mandate runs not just to placement decisions but to system-level choices: a recipient's "planning, service system design, funding, or service implementation practices" can themselves violate the Rule. *Id.* at 40,192. Where a recipient offers an "optional benefit" in an institutional setting, "the same or a substantially similar benefit must be offered in an integrated setting in a manner that does not incentivize institutional or other segregated services over community services." *Id.* at 40,121. And the obligation extends down to staffing: where workforce shortages impede integration, States must "address staffing shortages through pay rates, recruitment and retention incentives, flexible scheduling such as split shifts, or other actions." *Id.* at 40,122.

The second principal feature of the Final Rule is the "at-risk theory of discrimination." The Rule recognizes a discrimination claim even when no institutionalization or segregation has actually occurred. Specifically, it provides that "[f]ailure to provide community-based services that results in institutionalization or *serious risk of institutionalization*"—including through "planning, service system design, funding, or service implementation practices"—is itself a form of prohibited discrimination. *Id.* at 40,192. The Rule explains that "[q]ualified individuals with disabilities need not wait until the harm of institutionalization or segregation occurs to assert their right to avoid unnecessary segregation." *Id.* Despite receiving comments urging it to define the threshold for liability, HHS declined to specify the "parameters of the inquiry into 'serious risk.'" *Id.* at 40,121.

Beyond these two principal features, the Rule imposes detailed obligations in particular contexts. In the child welfare arena, for example, the Rule prohibits recipients from making placement, custody, visitation, or termination-of-parental-rights decisions "based on speculation, stereotypes, or generalizations" about a parent's or child's disability, and forbids requiring children "to be placed outside the family home through custody relinquishment . . . or other forfeiture of parental rights in order to receive necessary services." 89 Fed. Reg. at 40,189 (codified at 45 C.F.R. § 84.60). For enforcement, the Rule incorporates the procedures of Title I of the ADA, 42 U.S.C. §§ 12111–12117(b), 89 Fed. Reg. at 40,185 (codified at 45 C.F.R. § 84.16(b)), which in turn adopts the remedies and procedures of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-4(a)–(k)(4). Aggrieved individuals may thus file charges with the EEOC, which may pursue conciliation and litigation; for government employers, conciliation failures are referred to the Attorney General, who may sue the employer or issue a right-to-sue notice. The Attorney General is also authorized to pursue "pattern or practice" actions against recipients. 42 U.S.C. § 2000e-6.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is

"material" if resolving it one way or another would change the outcome of the lawsuit." *Sweetin v. City of Texas*, 48 F.4th 387, 391 (5th Cir. 2022). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

### The Administrative Procedure Act

"Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022). Under the Administrative Procedure Act (APA), a court must "hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (B), (C).

When analyzing the validity of a regulation, no deference is owed to an agency's interpretation of the statute unless the statute actually delegates discretionary authority to the agency. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). And even "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* (cleaned up).

There is no delegation of discretionary authority in Section 504. In fact, Section 504 limits agencies' authority to "such regulations as may be *necessary to carry out*" the Act. 29 U.S.C. § 794(a). "Any interpretation of § 504 must therefore be responsive to two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds." *Alexander v. Choate*, 469 U.S. 287, 299 (1985).

10

## ARGUMENT

### I.    The Rule is unlawful and in excess of statutory authority.

HHS has exceeded its statutory authority in the Final Rule. Section 504's anti-discrimination mandate does not impose liability for placing disabled persons at risk of unnecessary institutionalization nor does it require the disabled to be accommodated in the most integrated setting. The Fifth Circuit's ruling in *United States v. Mississippi* that identical language from the ADA could not establish at risk liability precludes reading at risk liability into Section 504. 82 F.4th 387 (5th Cir. 2023). Finally, by interfering with the administration of Medicaid, the Rule assumes regulatory authority over a critical healthcare program that the Rehabilitation Act does not expressly govern, intruding into issues of substantial "economic and political significance" without clear Congressional authorization. *West Virginia v. EPA,* 597 U.S. 697, 724 (2022) (major questions doctrine).

### A.  Section 504 does not provide for an "at risk" theory of discrimination.

"Statutory interpretation, as we always say, begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016). Section 504's anti-discrimination mandate provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under" a federally funded "program or activity." 29 U.S.C. § 794(a). The text does not reference risks, threats or other prospective acts and omits an express prohibition on placing disabled individuals at risk of institutionalization. The language that does appear denotes actions that directly impede an individual's access to federally-assisted programs. Moreover, Congress has amended the ADA and the Rehabilitation Act on several occasions and has never seen fit to revise the statutory language to include an "at risk" theory of discrimination. "[W]e ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997). Section 504's context amplifies its silence. The Rehabilitation Act contains detailed provisions on vocational rehabilitation, competitive employment, independent living, research, advocacy, and accessibility, *see, e.g.*, 29 U.S.C. §§ 701(b), 705, 720, 721, 796, but it nowhere creates a freestanding

11

duty for every federal-funding recipient to redesign health, social-service, or institutional systems to eliminate future risk of institutionalization.

Small wonder then that HHS did not premise its authority to promulgate the Final Rule on the text of Section 504. Instead, both the Final Rule and Notice of Proposed Rulemaking describe authority for the Rule as "Congress's intent that Title II of the ADA and Section 504 be interpreted consistently" and the consequent need for Section 504 regulations to "mirror the corresponding provisions in the Title II ADA regulation[s]." 89 Fed. Reg. 40,066; *see also* 88 Fed Reg. 63,393–94 (NPRM). At the outset, this offers no justification at all for the at-risk theory because current Title II regulations do not create liability for risk of institutionalization. Instead, the regulatory language discusses "segregation" in terms of actual exclusion or denial. *See e.g.,* 28 C.F.R. §§ 35.130, 35.149–.150. The Rule therefore outpaces its stated justification. Further, Congress's intent "is expressed by the . . . words [Congress] used," *Am. Tobacco v. Patterson*, 456 U.S. 63, 68 (1982), and while Title II of the ADA directs that its regulations be made consistent with pre-existing Section 504 regulations, 42 U.S.C. § 12134(b), the reverse is not true of Section 504.

An agency may not use an adjacent statute to "define other functions well beyond [its] specific power to [regulate]." *Gonzales v. Oregon*, 546 U.S. 243, 261 (2006). While Section 504 and Title II are interconnected, and the Fifth Circuit has stated that "[t]he ADA and the Rehabilitation Act generally are interpreted *in pari materia*[,]" *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011), neither statute incorporates the other wholesale and the Fifth Circuit has stressed that the overlap between the Rehabilitation Act and the ADA "does not mean that the two statutes are *always* interpreted identically." *Flynn v. Distinctive Home Care, Inc.*, 812 F.3d 422, 431 (5th Cir. 2016); *see also id.* at 428 (agreeing with sister circuits "that the Rehabilitation Act does not completely incorporate the terms of the ADA."). In particular, there is no statutory basis for simply imputing Title II's scope of liability standards to Section 504. Congress amended Section 504 to expressly incorporate the ADA's standards for determining employer liability, 29 U.S.C. § 794(d), but declined to do the same for its antidiscrimination provision. *See* ADA Amendments Act of

2008, Pub. L. No. 110-325, 122 Stat. 3553. Thus, even if the ADA could be understood to create liability for prospective institutionalization (it cannot), HHS cannot borrow its authority to regulate under Section 504 from a separate statute that makes a separate grant of rulemaking authority. *See Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) (stating that "an agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority" when in promulgating a rule under a specific statutory provision EPA had relied on a separate statutory authority).

The Final Rule is ultimately silent on which provisions of the Rehabilitation Act establish authority for the at-risk discrimination. The text of Section 504 is equally silent.

### B. The Fifth Circuit has foreclosed the at-risk theory of discrimination.

The Fifth Circuit's decision in *United States v. Mississippi* held that "[n]othing in the text of Title II, its implementing regulations, or *Olmstead* suggests that a *risk of institutionalization*, without actual institutionalization, constitutes actionable discrimination." 82 F.4th at 392 (emphasis in original). In particular, "the ADA does not define discrimination in terms of a prospective risk to qualified disabled individuals" because "[i]n stating that no individual shall be 'excluded,' 'denied,' or 'subjected to discrimination,' the statute refers to the actual, not hypothetical administration of public programs." *Id.*

The same reasoning must apply to Section 504 which uses identical language as the anti-discrimination provisions in Title II of the ADA. *Compare* 42 U.S.C. § 12132 *with* 29 U.S.C. § 794(a). Like Title II, Section 504 mandates that the disabled shall not "be *excluded* from the participation in, be *denied* the benefits of, or be *subjected to discrimination* under any program or activity . . . ." 29 U.S.C. § 794(a). Exactly alike, the operative language of these two statutes prohibits actual discrimination and does not address the potential for future discrimination. *See Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (stating that "when Congress uses the same language in two statutes having similar purposes, . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.") (citing *Northcross v. Board of Educ.*, 412 U.S. 427, 428 (1973)). Further, the Circuit's *in pari materia* construction of the two statutes

13

requires that their similar language be given the same effect. *Frame*, 657 F.3d at 223–24 (determining Title II and Section 504 should be given the same meaning when "parties have not pointed to any reason why Title II and § 504 should be interpreted differently"). Consequently, the Fifth Circuit's construction of Title II's anti-discrimination provision also controls the interpretation of Section 504.

The *Mississippi* Court also clarified that *Olmstead* does not endorse a theory of at-risk discrimination. Rather, "according to *Olmstead*, 'discrimination' occurs when an individual is 'unjustifi[ably]' institutionalized." *Mississippi*, 82 F.4th at 392. Accordingly, "the *Olmstead* decision supplies no basis for an at-risk claim," *id.* at 394, and the injury litigated by the *Olmstead* plaintiffs "turn[ed] on *actual* 'unjustifiable institutionalization,' not on hypothetical future events." *Id.* (emphasis added).

The Fifth Circuit's reading of *Olmstead* accords with the reasons that Court gave for finding unjustified institutionalization discriminatory. "Recognition that unjustified institutional isolation of persons with disabilities is a form of discrimination reflects [an] evident judgment[] . . . [that] confinement in an institution severely diminishes the everyday life activities of individuals." *Olmstead*, 527 U.S. at 600–01. The Majority based the discriminatory status of unnecessary institutionalization to the supposed harms of actual confinement. By contrast, the mere potential for institutionalization does not typically impede participation in everyday life activities. *Olmstead* does not greenlight an at-risk theory of discrimination and thus cannot be dragooned to shore up the Rule's wanting authority.

### C. Section 504 does not require federally-assisted programs to be delivered in the "most integrated setting."

The Final Rule also adds an "integration" mandate which requires every "recipient" of "federal financial assistance" to "administer a program or activity in the most integrated setting appropriate to the needs of a qualified person with a disability." 89 Fed. Reg. at 40,192. In imposing the "integration mandate," HHS claims to be codifying "longstanding case law" and cites specifically to the *Olmstead* case for its proposition that "covered entities" must "serve individuals

with disabilities in the most integrated setting appropriate to their needs." 89 Fed. Reg. at 40,117. Still relying on *Olmstead*, the Rule adds that *"[f]ailure to provide* community-based services that results in institutionalization or serious risk of institutionalization" is discriminatory. 89 Fed. Reg. at 40, 192. However, the Final Rule goes well beyond the text of Section 504, "longstanding case law," and even the most liberal reading of *Olmstead*.

The Final Rule defines "most integrated setting" by reference to a sweeping set of environmental specifications. Specifically, "most integrated setting" is defined as "a setting that provides individuals with disabilities the opportunity to interact with nondisabled persons to the fullest extent possible," that is "located in mainstream society," and that "afford [disabled] individuals choice in their daily life activities." 45 C.F.R. § 84.10; 89 Fed. Reg. at 40,183. The Rule treats anything short of that ideal as discriminatory "segregation," 45 C.F.R. § 84.76(c), and obligates States to redesign their entire systems of care to achieve it. 89 Fed. Reg. at 40,178.

Such a sweeping integration requirement is not a permissible implementation of Section 504. The plain statutory text of Section 504 is about exclusion, denial, and discrimination in existing state services, not about the adequacy or scope of those services. *See* 29 U.S.C. § 794(a). Section 504's operative text does not address institutionalization, segregation, integration, or community-based services. And nothing in it requires recipients to provide services in any particular setting. Indeed, the Rehabilitation Act's only mention of "integration" is a passing reference to Congress's support for "the principles of . . . inclusion, integration, and full participation" of individuals with disabilities. 29 U.S.C. § 701(c)(3). Such "general statements of federal policy" cannot ground substantive "legal duties." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 24 (1981).

Faced with Section 504's silence, HHS again relies on the ADA and its implementing regulations for authority for its integration mandate. 89 Fed. Reg. at 40,066; 89 Fed. Reg. at 40,117 (citing *Olmstead* and Title II rather than Section 504). Unlike Section 504, the ADA provides some basis for HHS to require integration. "In the Americans with Disabilities Act of 1990 (ADA), Congress described the isolation and segregation of individuals with disabilities as a serious and

15

pervasive form of discrimination." *Olmstead*, 527 U.S. at 588 (citing 42 U.S.C. §§ 12101(a)(2), (5)). The Court returned to those findings when it determined that "unjustified institutional isolation" constitutes discrimination, explaining that the ADA "specifically identifies unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination.'" *Id.* at 600; *but Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 260 (1994) (stating that "[w]e also think that the quoted statement of congressional findings is a rather thin reed upon which to base a requirement . . . neither expressed nor . . . fairly implied in the operative sections of the Act.").

The Rehabilitation Act contains no comparable language. The Act has no findings provision identifying segregation or institutionalization as discrimination. Nor does it contain an express preference for community-based services. Perhaps owing to this simplicity, HHS's previous Section 504 regulations, derived from the statute's antidiscrimination text, lacked the expansive integration requirement the Rule now imposes. *See* 88 Fed. Reg. 63,482, 45 C.F.R. § 84.4(b)(2) (2023). The old regulation did not contain a standalone integration section or system-design language. *Id.* Additionally, the relatedness of the two statutes makes the omission of any language specific to integration from the Rehabilitation Act especially poignant, since Congress could easily have issued the Act with similar findings to those it made in the ADA. *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ([W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

The Rule cannot impute the ADA's findings to Section 504. "An agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The power Congress conferred in Section 504 is limited to "such regulations as may be necessary to carry out" Section 504's nondiscrimination requirement, not that of another statute. Because the integration mandate has no anchor in the Rehabilitation Act's text and depends on findings unique to a different statute, it cannot be promulgated as a Section 504 regulation.

16

### D. Alternatively, the Rule's "most integrated setting" mandate exceeds Defendants' statutory authority by imposing a standard of care.

Even if Section 504's text could plausibly accommodate some integration requirement, it cannot accommodate the one HHS has imposed. By its terms, Section 504 prohibits an "otherwise qualified" person from being "excluded from," "denied the benefits of," or "subjected to discrimination under" a federally funded "program or activity." 29 U.S.C. § 794(a). That language addresses how recipients administer existing programs but does not require recipients to create new programs or to expand the services they offer. Rather than aligning with the statute's language, however, the Final Rule imposes an absolute obligation to perform services under an inflexible set of environmental specifications.

Section 504 does not "guarantee the handicapped equal results" but only requires "evenhanded treatment and . . . the opportunity for handicapped individuals to participate in and benefit from programs receiving federal financial assistance." *Alexander v. Choate,* 469 U.S. 287, 304 (1985). *Choate* rejected a challenge to a Tennessee decision to reduce the number of inpatient days covered by its Medicaid program on the basis that such a reduction would disproportionately impact the disabled. *Id.* at 289–90. The Court held that a State has no obligation to redesign its programs to provide more or different services to individuals with disabilities. *Id.* at 302–06, 303, n.21.

Likewise, the *Olmstead* Court emphasized that its decision did not "hold that the ADA imposes on the States a 'standard of care'" or "requires States to 'provide a certain level of benefits to individuals with disabilities.'" *Olmstead*, 527 U.S. at 603 n.14. As the Second Circuit has explained, *Olmstead* does not "stand for the proposition that states must provide disabled individuals with the opportunity to remain out of institutions." *Rodriguez v. City of New York*, 197 F.3d 611, 619 (2d Cir. 1999). The Ninth Circuit has likewise recognized that "[t]he ADA prohibits discrimination because of disability, not inadequate treatment for disability." *Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc); *see also Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003) ("It is clear from the language of Title II and the integration regulation that public

17

entities are not required to create new programs that provide heretofore unprovided services to assist disabled persons."); *cf. Buchanan v. Maine*, 469 F.3d 158, 174 (1st Cir. 2006) (recognizing the "distinction between ADA claims based on negligent medical care and those based on discriminatory medical care").

The Rule discards this limit. It treats a recipient's "planning, service system design, funding, [and] service implementation practices" as potential discrimination if they do not eliminate institutionalization, 45 C.F.R. § 84.76(d)(4); 89 Fed. Reg. at 40,192, and it commands recipients "directly or through . . . arrangements" to provide every service in the "most integrated setting" without regard to whether the service was ever offered in a community setting before. 45 C.F.R. § 84.76(b); 89 Fed. Reg. at 40,189. When an "optional benefit" is "provided in institutions or other segregated settings as part of the recipient's program, the same or a substantially similar benefit must be offered in an integrated setting." 89 Fed. Reg. at 40,121. Thus, under the Rule, an inadequate "level of benefits" constitutes discrimination.

Ironically, the Final Rule's integration mandate goes well beyond the integration requirement that HHS includes in its ADA regulations—purportedly the standard to which HHS is trying to conform the Final Rule. Title II's integration regulation provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting *appropriate* to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (emphasis added). The Rule's version does not limit integration to a level appropriate for the needs of qualified individuals. While the Rule retains the term "appropriate" in its operative text, its definition of "most integrated setting" dispenses with appropriateness. *See* 45 C.F.R. § 84.10. Tempering integration with the needs of disabled individuals is important because as the *Olmstead* Majority noted, "[f]or some [individuals], no placement outside the institution may ever be appropriate." *Olmstead*, 527 U.S. at 605; *see also id.* at 610 (Kennedy, J., concurring) ("It would be unreasonable, it would be a tragic event, then, were the Americans with Disabilities Act . . . to be interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision.").

The Final Rule omits other safeguards that limit the ADA's integration mandate. *Olmstead* cabined the reach of both Title II integration and its ruling on unjustified institutionalization so that integration could only be required for qualified persons for whom "the State's treatment professionals have determined that community placement is appropriate" and the "placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others." *Olmstead*, 527 U.S. at 587. The Court further relied on Title II's reasonable-modifications framework, 28 C.F.R. § 35.130(b)(7), and on the fundamental-alteration defense, observing that "States can resist modifications that entail a fundamental alteration of the States' services and programs." *Olmstead*, 527 U.S. at 597; *see id.* at 603–06. Those textual limits, the Court emphasized, ensure the integration mandate is "not boundless." *Id.* at 603.

The Rule converts the qualified, bounded obligation *Olmstead* recognized into an unqualified, system-wide one. It treats a recipient's entire "service system design" as potentially discriminatory, 45 C.F.R. § 84.76(d)(4); requires recipients to "ensur[e]" compliance not only by their own programs but by all entities to which they provide significant assistance, 89 Fed. Reg. at 40,109; and obligates States to take affirmative measures down to the personnel level, including changes to "pay rates, recruitment and retention incentives, [and] flexible scheduling," *id.* at 40,122. The Rule is no longer interpreting "discrimination" against a "qualified individual"; it is mandating the wholesale redesign of state programs without regard to the individualized inquiry *Olmstead* required and the textual limits the ADA provides. Section 504 simply prohibits an *existing* program or activity from discriminating against a qualified individual with a disability. The Final Rule, by contrast, prohibits the *failure to create new services and systems* and does so without limit, and without regard to any practical considerations. No reasonable interpretation of HHS's statutory authority could find that the Final Rule's scope is limited to what is "necessary to carry out" the statute.

### E.  The Rule violates the Major Questions Doctrine

When an agency "claims the power to resolve a matter of great political significance," "seeks to regulate a significant portion of the American economy," or "seeks to intrude into an

area that is the particular domain of state law," the agency action triggers the major questions doctrine. *West Virginia v. EPA*, 597 U.S. at 743–44 (Gorsuch, J., concurring). The "major questions . . . situates text in context" to "express an expectation of clear congressional authorization to support sweeping agency action." *Biden v. Nebraska*, 600 U.S. 477, 510–11 (2023) (Barrett, J., concurring). "The major questions doctrine is a tool for discerning—not departing from—the text's most natural interpretation." *Id.* at 508.

"Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line." *West Virginia*, 597 U.S. at 723 (quotation omitted). When an agency undertakes a "fundamental revision of the statute, changing it from [one sort of] scheme of . . . regulation into an entirely different kind," it must be able to show "clear congressional authorization." *Id.* at 728. When "the question at issue is one of deep economic and political significance," Congress must "delegate such authority expressly, if at all, for extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices." *Loper*, 603 U.S. at 405 (cleaned up).

The Final Rule triggers the major questions doctrine. It demands fundamental changes to every state Medicaid program and oversteps the limits of Section 504 into areas of state lawmaking concern.

The Rule's effects carry vast "economic significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,* 594 U.S. 758, 764 (2021). The federal contribution to Medicaid varies across different States but invariably leaves state governments on the hook for a significant share of Medicaid expenditures. During the current fiscal year, the "regular" Federal Medical Assistance Percentage (FMAP) are set at the following percentages for Plaintiff States: Texas 58.54%; Alaska 51.37%; Florida 55.43%; Kansas 65.50%; Louisiana 68.14%; Missouri 64.58%; Montana 60.01%; and South Dakota 50.56%. *See* 90 Fed. Reg. 54,698-54,299. Plaintiffs are responsible for funding their remaining Medicaid costs. 42 U.S.C. § 1396d(b). "Medicaid spending accounts for over 20 percent of the average State's total budget," and the *federal* financial

20

assistance portion of Medicaid was estimated at "approximately $3.3 trillion between 2010 and 2019" just for the mandatory coverage groups. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. at 581. This amount far exceeds the "nearly $50 billion" that the Supreme Court has previously found to meet the threshold of vast economic significance. *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.,* 594 U.S. at 764 (finding that CDC rule created economically significant consequences).

By encroaching on state budgetary and policymaking discretion, the Rule's changes also carry vast political significance. The Final Rule expressly prohibits "[f]ailure to provide" adequate "funding" for community-based services. 89 Fed. Reg. 40,192. Since this prohibition applies to all "recipients" it directly affects State budgetary decisions. *Id.* Accordingly, this prohibition creates the potential for liability when States reduce funding for Medicaid and other programs, applying legal pressure to state fiscal decisions. But states have full rein over their own appropriations as well as the administration of their Medicaid program. *See AbbVie, Inc. v. Fitch*, 152 F.4th 635, 647 (5th Cir. 2025). The Rule also branches out into child welfare, another domain of traditional state concern. The Final Rule applies its integration mandate to child welfare programs and even to placement decisions regarding children in foster care. 89. Fed. Reg. at 40104, 40189.

The Rule has twisted Congress's straightforward prohibition on discrimination into a mandate for States to redesign their Medicaid programs and intrudes into areas of particular state concern. This Court should "hesitate before concluding that Congress" intended to confer the authority now claimed by HHS. *West Virginia*, 597 U.S. at 725.

## II. The Rule is arbitrary and capricious.

Even apart from the Defendants' lack of authority to enact the Final Rule in the first place, it remains true that every agency's actions must still be "reasonable and reasonably explained." *Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). This standard is not one that the Courts should readily disregard. *Id.* (noting that the standard "has serious bite."). The Court "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Id.*

Moreover, a Court must set aside an agency action that "fail[ed] to respond to 'significant points' . . . raised by the public comments." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021) (quoting *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019)).

### A. HHS failed to address the Rule's conflict with CMS Regulations.

Since Section 504 applies to all recipients of federal funds, States that receive Medicaid funding are subject to the Rule's new obligations. However, the Final Rule is totally misaligned with the CMS and DOJ regulations that govern Medicaid.

As discussed above, States may provide Medicaid only on terms CMS approves. One foundational federal requirement is that a state Medicaid plan "provide such methods and procedures . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). And to provide home and community-based services beyond what the standard Medicaid plan allows, a State must control program costs and prove "cost neutrality" to CMS.

Contradicting these requirements, the Rule requires Medicaid-participating States—*because* of their participation in Medicaid—to provide services beyond what Medicaid requires or even permits. It rules out States' ability to defend their existing programs by asserting that "[p]roviding services beyond what a State currently provides under its Medicaid program may not be a fundamental alteration" to its system. 88 Fed. Reg. 63,487. And it warns that "[s]ervice reductions resulting from budget cuts—even where permitted under Medicaid and other public program rules—may violate the integration mandate if they create a serious risk of institutionalization or segregation." 88 Fed. Reg. 63,485. The Rule thus treats compliance with HHS's own cost-control rules as potential evidence of discrimination.

The result is an impossible situation. A State that follows CMS's Medicaid rules is in jeopardy of "discriminating" under the Rule. A State that abandons Medicaid altogether—to escape that jeopardy—sacrifices the federal partnership that funds care for its needy and disabled residents. Either way, the burden falls on the very populations Section 504 was meant to protect.

22

Plaintiffs and other commenters raised this conflict during notice-and-comment. HHS's response was to acknowledge receipt and move on. *See* 89 Fed. Reg. 40,178. The Supreme Court has made plain that an agency's response that "did not address the . . . concern so much as sidestep it" cannot survive arbitrary-and-capricious review. *Ohio v. EPA*, 603 U.S. 279, 295 (2024). HHS's response to the CMS conflict is exactly that kind of sidestep.

Relatedly, HHS departed from the lead agency's most recent Title II regulations without explanation. The Department of Justice—the coordinating and lead agency on disability-rights implementation—has issued multiple revisions to its Title II regulations in 2024 alone, including a final rule on accessibility standards for medical diagnostic equipment, 89 Fed. Reg. 65,180 (Aug. 9, 2024), and a final rule on web and mobile accessibility, 89 Fed. Reg. 31,320 (Apr. 24, 2024). Neither contained anything resembling the Rule's integration mandate or its at-risk theory. DOJ has acknowledged that "[g]iven Congress's intent for parity between Section 504 and Title II of the ADA, the Department [of Justice] must also ensure the consistency of any related agency interpretations of those provisions." 89 Fed. Reg. at 31,321. HHS has now broken that parity, without ever explaining why.

By ignoring the conflict between the Rule and CMS's rules—and by departing from DOJ's parallel Title II regulations without acknowledgment—HHS has created an illogical system of conflicting permissions and punishments. State Medicaid programs expand access to care for needy populations through a partnership with HHS; the Rule penalizes States for participating in that partnership.

**B. HHS unreasonably dismissed binding Fifth Circuit precedent and risks creating non-uniform regulation.**

The Fifth Circuit decided *Mississippi* the year before the Final Rule was promulgated and mere weeks after HHS issued the corresponding NPRM. Further, several commenters, including many of the Plaintiffs, used public notice-and-comment to warn Defendants that the Rule is inconsistent with *Mississippi* and that it consequently does not fit the Fifth Circuit's understanding

23

of the limits of federal discrimination law.[3] Instead of engaging with these well-founded concerns, HHS dismissed *Mississippi*'s ruling on at risk discrimination as mere "dicta," 89 Fed. Reg. at 40,120, concluding the Rule reflected the "consensus in circuit courts," *id.*, and followed "major legislative and judicial developments" and 89 Fed. Reg. at 40,066.

HHS' dismissal of *Mississippi* as unimportant dicta is remarkable given the centrality of the at-risk theory to the government's case. *See* Compl., *United States v. Mississippi*, No. 3:16-cv-622, at 1 ¶ 1 (S.D.Miss. Aug. 11, 2016) (alleging that "[t]he State discriminates against adults with mental illness by administering and funding its programs and services . . . in a manner that has . . . placed them at serious risk of [] institutionalization"); Br. of the United States as Plaintiff-Appellee, No. 21-60772, at 25 (Mar. 29, 2022 5th Cir.) (arguing "Mississippi is wrong in arguing that Title II protects only individuals who are 'actual[ly] institutionaliz[ed]' and not also those 'at risk' for future institutionalization."). Likewise, the Court's rejection of the at-risk theory was central to its conclusion that Mississippi had not engaged in Title II discrimination. The Court unmistakably singled out "the federal government's novel theory of liability" in reversing the district court. *Mississippi*, 82 F.4th at 389, 391–92; *see also id.* at 398 (concluding that "[t]he possibility that some un-named individual with serious mental illness or *all* such people in Mississippi could be unjustifiably institutionalized in the future does not give rise to a cognizable claim under Title II."). Far from a considered reading, HHS's response to *Mississippi* is a mere refusal to wrestle with a difficult case.

Relatedly, HHS failed to address how *Mississippi* might ultimately prevent the Rule from taking effect within the Fifth Circuit, inhibiting the uniformity of federal regulation. *See Ohio v. EPA*, 603 U.S. at 293–295 (concluding that EPA was arbitrary and capricious when it relied on assumptions about the uniformity of its regulation without considering the likely prospect those

---

[3] Comment from Alaska Department of Law, HHS-OCR-2023-0013, HHS-OCR-2023-0013-0001, 2023-19149 (Nov. 19, 2023), available at https://www.regulations.gov/comment/HHS-OCR-2023-0013-0763 ("Alaska Letter").

assumptions would fail and create non-uniform regulatory scheme). HHS has effectively codified one side of a circuit split without any thought of the potential consequences.

By ignoring federal caselaw that does not serve its policy goals, HHS failed to consider "an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and has promulgated an arbitrary set of rules that will apply unevenly across the country.

### C. HHS failed to consider the significant fiscal and administrative burdens the Rule imposes on States.

As HHS acknowledges, "most" health care providers receive federal financial assistance,[4] many of whom provide services to Medicaid recipients. Medicaid is also "the nation's primary funder of home and community-based services (HCBS)." 88 Fed. Reg 63,482. The financial and operational stakes for States and the providers they rely on cannot be overstated.

The Rule magnifies those stakes by holding States vicariously responsible for every contracted provider, however small. As HHS put it, a State "remains responsible for ensuring that [an] entity with whom it contracts complies with Section 504. The size of that entity is irrelevant." 89 Fed. Reg. 40,109. Under the Rule, then, a State must ensure that *every single provider* of Medicaid services—no matter how small or how specialized—administers services in the prescribed "most integrated setting," in any manner necessary to forestall any individual's "risk" of future institutionalization. And it must do so even though the State cannot compel *any* provider to enroll in Medicaid in the first place, much less to deliver specific services in specific settings.

HHS made no serious attempt to measure these burdens. The integration mandate received only a cursory mention in a four-page "other revisions" section of the 146-page Regulatory Impact Analysis accompanying the NPRM, and that paragraph rested on the conclusory premise that the addition "is consistent with Title II of the ADA and relevant case law"

---

[4] U.S. Dep't of Health & Hum. Servs., Office for Civil Rights, Section 504 of the Rehabilitation Act of 1973 Notice of Proposed Rulemaking: Regulatory Impact Analysis (RIA), at 6 (2023), https://www.hhs.gov/sites/default/files/sec-504-rehab-act-npr-ria.pdf.

and would therefore impose "no additional associated costs of implementation."[5] The at-risk theory of discrimination received no analysis at all.

HHS's invocation of the Unfunded Mandates Reform Act of 1995 fares no better. UMRA "requires the Department to prepare a written statement, which includes an assessment of anticipated costs and benefits, before proposing 'any rule that includes any Federal mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any one year.'" 89 Fed. Reg. 40,174. Yet HHS "decline[d]" to provide an UMRA analysis on the theory that the Rule is exempt as one "that enforces nondiscrimination on the basis of disability." 89 Fed. Reg. 40,179. That position relies on the very conclusion it is supposed to test: it treats as established the notion that the integration mandate and at-risk theory simply "enforce" existing nondiscrimination law, citing "decades of consensus in circuit courts" and "the unambiguous requirements of existing Title II and Section 504 regulations." 89 Fed. Reg. 40,120. As discussed above, neither the consensus nor the conformity is real. By assuming the merits and skipping UMRA, HHS deprived itself—and the public—of any reasoned assessment of the Rule's costs.

Plaintiff State of Alaska raised these very concerns about financial and practical impacts on States and providers.[6] HHS neither explained the gaps in its analysis nor performed any supplementary analysis before finalizing the Rule. Instead, the Final Rule preserves the NPRM's analytical shortcuts wholesale.

An agency cannot expand the scope of a statute through regulation, without accountability, by merely asserting that the regulation enforces a "statutory right" that is *created by the regulation itself.* This is the very definition of arbitrary and capricious.

### III. The Final Rule is unconstitutionally coercive and commandeers state government.

"As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452 (1991). This

---

[5] RIA at 145-56.
[6] AR-001788.

system of federalism ensures the continued sovereignty of the states. "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program". *Printz v. United States*, 521 U.S. 898, 935 (1997).

Grants of federal funding to the states are enacted pursuant to Congress' Spending Clause authority, which allows it to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds.'" *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987). "But this power is not unlimited." *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, and n. 13 (1981). When Congress exercises its spending power, principles of federalism require that conditions on federal expenditures must be (1) "unambiguous[]" so that States are able to "exercise their choice knowingly, cognizant of the consequences of their participation," (2) related to the "federal interest in the project," (3) spending must not "induce the States to engage in activities that would themselves be unconstitutional," and (4) spending must not "be so coercive as to pass the point at which 'pressure turns into compulsion.'" *Dole*, 483 U.S. at 207–11 (quoting *Charles C. Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)).

"Legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst*, 451 U.S. at 17. "The legitimacy of Congress's exercise of the spending power 'thus rests'"—in part—"on whether the [State] voluntarily and knowingly accepts the terms of the 'contract,'" *id.* at 577 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)), and Congress may not use federal spending "to exert a 'power akin to undue influence.'" *Id.* (quoting *Steward Machine*, 301 U.S. at 590). Accordingly, any conditions on the grant of federal moneys must be imposed "unambiguously." *Pennhurst,* 451 U.S. at 17. "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is

27

expected of it." *Id.*; *see also Dole*, 483 U.S. at 207 (stating to be constitutional spending condition must enable states "to exercise their choice knowingly").

Further, conditions on federal spending are unconstitutional when they "cross[] the line distinguishing encouragement from coercion." *New York v. United States*, 505 U.S. 144, 175 (1992). When "pressure turns into compulsion, [that] legislation runs contrary to our system of federalism." *Sebelius*, 567 U.S. at 578 (quotation omitted). One way the federal government can violate the anti-coercion principle is by adding new conditions to state participation in a federal spending scheme that postdate original enactment. Congress exceeds its spending clause powers by "surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. New legislation or regulations that surprise States with *ex post facto* conditions "undermine[s] the status of the States as independent sovereigns in our federal system." *Sebelius*, 567 U.S. at 577.

Here, the Final Rule surprises states with substantial new conditions on federal funding. By redefining Section 504 to include a newly formulated "integration mandate" and "at risk" theory of discrimination, the Rule adds requirements that cannot be discerned from the statute's text. Conditions attached to federal grants must be unambiguous so that States can "clearly understand" from statutory language the terms on which they accept federal funding. *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Because Section 504 does not unambiguously provide for integration or at-risk discrimination, States have not had clear notice that these requirements could be applied to them.

Nor does the Rehabilitation Act's policy statement, containing a bare statement of support for "inclusion, integration, and full participation," 29 U.S.C. § 701(c)(3), provide notice. A statement of Congress's preferred policy does not create a condition on federal spending. *Pennhurst*, 451 U.S. at 31–32 (concluding that "national policy" set out in Developmentally Disabled Assistance and Bill of Rights Act could not "require[] the States, at their own expense, to provide certain kinds of treatment.") The precatory language of a policy statement is "too general" to impose mandatory conditions and cannot require States to "promote [Congress's]

28

goals at the expense of all other considerations, including fiscal considerations." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. at 303 (determining that the stated goals of the Individuals with Disabilities Education Act did not create a condition on spending).

Neither integration nor at-risk liability are unambiguously contained in Section 504. HHS may not regard the Act as the source of hidden conditions that the States unwittingly signed off on when they accepted federal money. *See Pennhurst,* 451 U.S. at 17.

Similarly, the Final Rule is also coercive. Section 504 applies to all programs that receive federal funds, so the Final Rule forces States to choose between compliance with the new regulations and accepting nearly any amount of federal funding. The Final Rule makes clear that its requirements apply to a broad swathe of education and child welfare programs. *See* 89 Fed. Reg. 40104, 40180, 40187–89. Many of these programs are jointly administered by the federal government and the States or are state programs that receive substantial federal money. *See e.g., id.* at 40078–79 (discussing CCDBF/CCDF-funded childcare providers); *id.* at 40188-89. But the Rehabilitation Act does not itself authorize significant education or child welfare spending. Instead, like most of the federal outlays that the Rule will apply to, the education and welfare funding in the Rule is disbursed pursuant to separate articles of legislation. When spending "conditions take the form of threats to terminate other significant independent grants," they "are properly viewed as a means of pressuring the State to accept policy changes." *Sebelius*, 567 U.S. at 580. The Final Rule's broad reach renders it coercive. By setting up a Hobson's choice between the immense volumes of federal funding and compliance, the Rule deprives the States of a meaningful opportunity to opt out of the new requirements.

Additionally, the Rule is coercive because its new requirements are retroactive. Most of the federal spending to which the Rule applies predates its promulgation. Thus, the Rule burdens state reliance on longstanding federal funding sources. In *Sebelius*, the Supreme Court held that changes to the Medicaid program which mandated that participating States expand the coverage of their Medicaid services violated the Spending Clause. 567 U.S. at 587; *see also id.* at 584 (stating that "A State could hardly anticipate that Congress's reservation of the right to 'alter' or 'amend' the

Medicaid program included the power to transform it so dramatically."). Just as in *Sebelius*, due to the Final Rule, States "must either accept a basic change in the nature of [disability protections], or risk losing all [federal] funding." *Id.*

The APA requires courts to set aside and vacate agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B); *see also id.* § 706(2)(A). Because the Rule's requirements are not clearly derived from Section 504 and are coercive, the Final Rule violates the Spending Clause and is therefore contrary to constitutional right.

## IV. Plaintiff States have standing.

Standing requires no more than "an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. at 409)). Where "the plaintiff is himself an object of the action . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (quotation omitted) (APA case). The Rule injures Plaintiffs both by imposing significant new compliance burdens and by interfering in the implementation of their own laws and policies.

"An increased regulatory burden typically satisfies the injury in fact requirement." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015). The Final Rule's new requirements directly apply to Plaintiff States. States are expressly defined as "recipients," 89 Fed. Reg. at 40,184, and are made responsible for complying with the Rule both in the programs they directly administer and those they allocate federal awards to. *Id.* at 40,109. Indeed the Rule is distinctly indifferent to the compliance burdens it places on states, and even directs that if a workforce shortage affects a recipient, including a State, the State must "address staffing shortages through pay rates, recruitment and retention incentives, flexible scheduling such as split shifts, or other actions." 89 Fed. Reg. at 40,122.

The Rule's new compliance burdens will entail substantial costs. The Final Rule itself acknowledges that States will incur annualized costs of between $563.6 million and $589.8 million

30

per year due to its requirements. 89 Fed. Reg. at 40,178. Additionally, the Rule requires state recipients to "ensur[e]" compliance not only by their own programs but by all "entities to which they provide significant assistance," 89 Fed. Reg. at 40,109. The breadth of this requirement would force States either to add expensive new oversight and assistance functions or risk liability due to incompliance.

The Rule also harms Plaintiffs' sovereignty. "[S]tates have a sovereign interest in the power to create and enforce a legal code." *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015) (cleaned up). The Final Rule would require the States' respective healthcare authorities to elevate the terms of the Final Rule over the requirements of their own laws. For example, under Alaska law, any addition of optional groups of recipients or services to the Medicaid program must be enacted as law through the legislature. *See* Alaska Stat. 47.07.020, Alaska Statute 47.07.030. Under the Final Rule's new regime, the state executive would be required to provide healthcare services beyond what is permitted in state law, sufficient to prevent the risk of institutional care – or risk liability in suits by private individuals or the federal government.

Finally, Plaintiff Alaska suffers especially severe harm from the Rule's requirement to "ensure" compliance by sub-recipients. In 1975, Congress passed the Indian Self-Determination and Education Assistance Act ("ISDEAA") to promote a "meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." 25 U.S.C. § 5302(b); *see also Ito v. Copper River Native Ass'n*, 547 P.3d 1003, 1010 (Alaska 2024). ("Native tribes . . . are sovereigns . . . entitled to tribal sovereign immunity.").

There are 227 federally recognized Tribal entities within the state of Alaska, "recognized to have the immunities and privileges available to federally recognized Indian Tribes by virtue of their Government-to-Government relationship with the United States as well as the responsibilities, powers, limitations, and obligations of such Indian Tribes." 88 Fed. Reg. 2,112 (Jan. 12, 2023).

31

Payment for health care provided through a tribal entity is differently calculated and compensated—notably, the federal medical assistance percentage is *100 percent* for services provided through a tribal entity. 42 U.S.C. § 1396d (emphasis added). While Alaskans rely on the quality care provided by tribal health entities, the State of Alaska cannot conscript tribal health entities into performing services. Nor can the state change the federally calculated reimbursement rate. But because the State processes tribal Medicaid claims and distributes federal reimbursement, the Final Rule holds the State responsible for ensuring that sovereign tribal entities comply with the new mandates. This is an impossible demand.

Plaintiffs' harms stem directly from the Final Rule and a ruling by this Court vacating or enjoining the Rule would terminate the effects it has on Plaintiffs. Accordingly, Plaintiffs' injuries are "traceable" to the Final Rule and are "redressable by a favorable ruling," *Clapper*, 1568 U.S at 409.

### V.   The entire Rule is unlawful and should be vacated in its entirety.

Under the APA the "default rule is that vacatur is the appropriate remedy" when an administrative agency has acted unlawfully. *Data Mktg. PShip, L.P. v U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022); *see also Corner Post, Inc. v. Bd. of Govs. of Fed. Reserve Sys.*, 603 U.S. 799, 826–43 (2024) (Kavanaugh, J., concurring) (explaining that "set aside" in the APA means "vacatur of agency actions").

Further, no part of the Final Rule is severable, because the rule is entirely founded on the unlawful principles of the "integration mandate" and "at risk" theory. The Rule represents a single policy position with the goal of a wholesale reinterpretation of disability law. A boilerplate severability clause cannot save a rule when invalidation of one portion would "impair the function" of the whole or "the regulation would not have been passed but for its inclusion." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988). The entire rule must be vacated in its entirety.

### CONCLUSION

For the foregoing reasons, Plaintiffs move this Court to grant Plaintiffs' motion for Summary Judgment, declare the Rule unlawful, permanently enjoin, and vacate the Rule.

32

Dated: May 4, 2026.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

ROB FARQUHARSON
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division

**ZACHARY L. RHINES**
Special Counsel
Special Litigation Division
Texas State Bar No. 24116957
zachary.rhines@oag.texas.gov

*/s/ Kyle S. Tebo*
**KYLE S. TEBO**
Special Counsel
Legal Strategy Division
Texas State Bar No. 24137691
kyle.tebo@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF
TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone:     (512) 463-2100
Facsimile:     (512) 457-4410

**COUNSEL FOR STATE OF TEXAS**

Respectfully submitted,

STEPHEN J. COX
Attorney General of Alaska

*/s/ Laura O. Russell*
**LAURA O. RUSSELL***
Alaska Bar No. 1311106

Assistant Attorney General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
Telephone: (907) 269-5100
laura.russell@alaska.gov

**COUNSEL FOR STATE OF ALASKA**
*\*Pro Hac Vice*

JAMES UTHMEIER
Attorney General of Florida

*s/ Christine Kimberly Pratt*
**CHRISTINE KIMBERLY PRATT**
Office of the Florida Attorney General
400 S. Monroe Street
Tallahassee, Florida 32399
(352) 359-6689
christine.pratt@myfloridalegal.com

**COUNSEL FOR STATE OF FLORIDA**

KRIS W. KOBACH
Attorney General of Kansas

*/s/ James Rodriguez*
**JAMES RODRIGUEZ**
Assistant Attorney General
120 SW 10th Ave
Topeka, Kansas 66612-1597
Telephone: (785) 260-3960
jay.rodriguez@ag.ks.gov

**COUNSEL FOR STATE OF KANSAS**

33

ELIZABETH B. MURRILL
Attorney General of Louisiana

*s/ J. Benjamin Aguiñaga*
**J. BENJAMIN AGUIÑAGA***
Solicitor General
Office of the Attorney General
1885 N. 3rd St.
Baton Rouge, Louisiana 70802
Telephone:    (225) 506-3746
aguinagab@ag.louisiana.gov

**COUNSEL FOR STATE OF LOUISIANA**
*Pro Hac Vice*

CATHERINE L. HANAWAY
Attorney General of Missouri

**LOUIS JOSEPH CAPOZZI, III**
Solicitor General
Office of the Missouri Attorney General
207 W. High Street
Jefferson City, Missouri 65101
Louis.capozzi@ago.mo.gov

*/s/Alex Buttram*
**ALEX BUTTRAM***

Assistant Solicitor General
Office of the Missouri Attorney General
815 Olive Street, Ste 200
St. Louis, MO 63101
Alex.Buttram@ago.mo.gov

**COUNSEL FOR STATE OF MISSOURI**
*Pro Hac Vice*

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ Christian B. Corrigan*
**CHRISTIAN B. CORRIGAN**
Solicitor General
**PETER M. TORSTENSEN, JR.***
Deputy Solicitor General
Montana Department of Justice
215 N. Sanders Street
Helena, Montana 59601
Telephone: (406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

**COUNSEL FOR STATE OF MONTANA**
*Pro Hac Vice*

### CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2026, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF), and that all counsel of record were served by CM/ECF.

*/s/ Kyle S. Tebo*
KYLE S. TEBO

34